Robley H. EVANS and Julia M. Evans,
Petitioners,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

No. 15985.

United States Court of Appeals
Ninth Circuit.

Jan. 26, 1959.

Roswell Magill, New York City, Lyle L. Iversen, Seattle, Wash., Edgar Bernhard, Donald J. Yellon, Chicago, Ill., John C. Klett, Jr., Cravath Swaine & Moore, New York City, D'Ancona, Pflaum, Wyatt & Riskind, Chicago, Ill., for petitioners.

Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, J. Dwight Evans, Jr., Dept. of Justice, Washington, D. C., for respondent.

Before POPE, HAMLEY and JERTBERG, Circuit Judges.

JERTBERG, Circuit Judge.

The main issue presented to this Court on the petition for review of the decision of the Tax Court of the United States centers on the rate of depreciation to which the taxpayers are entitled on automobiles used by them in their business of leasing automobiles to a corporation which was engaged in the business of leasing and renting automobiles to the public.

The Tax Court entered its decision finding deficiencies in income tax due from taxpayers for the years 1950 and 1951 in the respective amounts of $13,191.52 and $13,048.12.

There appears to be no dispute between the parties as to the character of the taxpayers' business or the manner in which it was conducted during the years in question.

During the years 1950 and 1951 Robley H. Evans and Julia M. Evans [1] were husband and wife. During these years Robley H. Evans (hereinafter designated as petitioner) was engaged in the business of leasing automobiles to Evans U-

---

1. Julia M. Evans is a party solely because of the filing of joint returns for the taxable years involved.

Drive, Inc. (hereinafter called U-Drive) at a monthly rental of $45 per month per automobile. U-Drive was engaged in the business of leasing and renting automobiles to the public, which business was managed by the petitioner.

The lease agreement between petitioner and U-Drive provided that petitioner was obligated to furnish U-Drive with a sufficient number of automobiles to enable it to conduct and operate an automobile leasing and renting business in an efficient manner.

During the taxable years under review U-Drive engaged in two types of rental activities, which for convenience might be termed short term rentals and extended rentals. Short term rentals varied from a few hours to several weeks. Extended rentals varied from eighteen months to thirty-six months, and accounted for thirty to forty per cent of automobile rentals.

Under the lease agreement with U-Drive, petitioner retained title to the automobiles, and had the right to sell and dispose of any of them at any time.

Petitioner periodically owned more automobiles than were necessary for the efficient operation of short term rentals. When this situation arose he would examine the cars in use and sell the number which were not needed. The oldest and least desirable cars were sold first. When sold, such cars had been driven an average of 15,000 to 20,000 miles, and were generally in good mechanical condition. Many automobiles were sold at the end of the tourist season. When sold, each car had been in use about fifteen months. These cars could have been used longer than they were, but customers of U-Drive demanded late model cars that were currently in style.

Automobiles to be used for extended rentals were purchased by petitioner when needed and leased to others by U-Drive. At the termination or cancellation of such leases, the automobiles were returned to petitioner, who sold them. When sold, such cars had been driven an average of 50,000 miles. They were generally in good physical condition and state of repair at the time of disposition, and petitioner could have continued to use them longer than he did.

Petitioner sold most of his surplus automobiles to used car dealers, jobbers, or brokers, and as a general rule the automobiles when sold brought current wholesale prices. Petitioner purchased new cars from local dealers, usually at factory prices.

Petitioners' tax returns for 1950 and 1951 revealed that he sold 140 and 147 automobiles respectively during those years. The average cost, sales price, depreciation claimed, and gain per car were approximately as follows:

| Year | Cost | Sales Price | Depreciation Claimed | Gain |
|------|------|-------------|----------------------|------|
| 1950 | 1650 | 1380 | 515 | 245 |
| 1951 | 1495 | 1395 | 450 | 350 |

In such tax returns the amounts of depreciation taken were computed and deductions claimed on the basis that the automobiles had an estimated useful life of four years, with no salvage at the end of the four-year period.

The Tax Court determined:

1. That the automobiles which petitioner leased to U-Drive during the taxable years for use under extended rentals had a useful life of three years and a salvage value of $600.00;

2. That the automobiles which he leased to U-Drive for use under short term rentals had a useful life of fifteen months and a salvage value of $1,375.-00;

3. If the undepreciated [adjusted] cost of the automobiles in service at January 1, 1950 is less than $600.00 and $1,-

375.00 for the respective classes of automobiles, then that amount will be the salvage value of those automobiles.

Computations based upon such decision resulted in the amounts of deficiency above mentioned for the years under review.

In the notice of deficiency directed to petitioner, the Commissioner stated that "It has been determined that *the average useful life of the automobiles used in your business* based on your actual experience was not in excess of seventeen months and the average *salvage value* of said automobiles at the *end of their useful life in your business* was not less than $1,325.00 or the adjusted basis of said automobiles as of January 1, 1950, whichever amount was the lesser." (Emphasis added)

The Tax Court found that "The surplus automobiles sold by Robley (Evans) could have been used longer than they were; however, customers demanded late model automobiles that were currently in style. Older automobiles did not have much value as rental vehicles. During the taxable years, Robley (Evans) sold the automobiles used by U-Drive in the short-term rental phase of its business after they had been used about 15 months. And he usually sold the automobiles which had been leased for extended terms as soon as the lease was terminated." The Tax Court further found that 30 to 40 per cent of the automobiles leased by petitioner to U-Drive were on the extended rental basis, which period was from 18 months to 36 months, and that as a general rule the automobiles were sold at current wholesale prices. In its opinion the Tax Court stated that petitioner had consistently claimed deductions for depreciation (apparently since 1936) on the basis that his automobiles had a useful life of four years, with no salvage value at the end of the four-year period.

It is the petitioner's position on this review that until the opinion of the Tax Court herein, judicial interpretation, administrative practice under the 1939 Code, and practice in the accounting profession generally, had long agreed that, for the purpose of the depreciation deduction, the term "useful life" means the physical, economic or functional life of the property subject to the depreciation allowance, and the term "salvage value"—the value remaining in depreciable property at the end of its physical, economic or functional life—means its residual or scrap value.

Analysis of the findings of fact, conclusions of law, and decision of the Tax Court unmistakably reflect that the Tax Court measured "useful life" by the holding period of the automobiles leased by petitioner to U-Drive, and measured "salvage value" by the estimated proceeds which might be realized upon the disposition of such automobiles.

The Tax Court's opinion contains no discussion as to the legal signification of the terms "useful life" and "salvage value". The concepts of such terms and the contentions in relation thereto as advanced by the petitioner were not mentioned. The question presented by this review is a narrow one, although not without its difficulties. In most instances, an asset used in the trade or business remains in the service of the taxpayer until its economic usefulness has been exhausted. Under such circumstances, no problem arises as to the useful life of the asset, and the value remaining in the asset at the end of such useful life—its salvage value—is generally its scrap or junk value. The problem is acute with respect to taxpayers, the nature of whose business requires, for various reasons, a policy of disposing of depreciable assets while such assets still possess substantial value, and which property brings on disposal prices considerably in excess of the scrap or junk value. Such a business is the type in which petitioner engages.

It is our view that the issue presented by the conflicting concepts of "useful life" and "salvage value" involve principally taxpayers engaged in such type of business whose tax years under the Internal Revenue Code of 1939 are open for review and assessment by the Com-

missioner. This issue may also involve taxpayers engaged in such type of business whose tax years prior to the enactment of Section 167 of the Internal Revenue Code of 1954 and the issuance of Treasury Regulations T. D. 6182 are likewise open for review and assessment. See Hertz Corporation, etc. v. United States, D.C.Del. 1958, 165 F.Supp. 261.

In enacting section 167 of the Internal Revenue Code of 1954 (Title 26 U.S.C.A. § 167), Congress authorized several new methods for computing depreciation for taxable years ending after December 31, 1953. Section 167(b) states that a "reasonable allowance" as used in section 167 (a) shall include an allowance computed in accordance with regulations prescribed by the Secretary, under any of the prescribed methods and rates. Sections 167 (b) and 167(c) prescribe allowable methods and rates for computing depreciation, as well as certain limitations on the use of such methods. The allowable methods are the straight line method, the declining balance method, the sum of the years-digits method, and any other method productive of an annual allowance which does not exceed the allowance computed under the declining balance method. If an allowance is reasonable under section 167(a), it shall not be limited or reduced by any provision contained in section 167(b). Section 167(c) restricts the accelerated method contained in section 167(b) to new construction and to new tangible property with a useful life of three years or more.

Regulations under the Internal Revenue Code of 1954 were issued June 7, 1956, T.D. 6182, 1956—1 Cum.Bul. The depreciation provisions of these regulations relevant to this discussion are set forth in section 1.167(a)–1. Section 1.-167(a)–1–(a) states that the allowance [reasonable allowance under section 167 (a) of the Code] is "that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan [not necessarily at a uniform rate], so that the aggregate of the amounts set aside, plus the salvage value, will, at the end of the estimated useful life of the depreciable property, equal the cost or other basis of the property * * * An asset shall not be depreciated below a reasonable salvage value under any method of computing depreciation. * * * The allowance shall not reflect amounts representing a mere reduction in market value."

Section 1.167(a)–1–(b) states "For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. * * * "

Section 1.167(a)–1–(c) states, "Salvage value is the amount (determined at the time of acquisition) which is estimated will be realizable upon sale or other disposition of an asset when it is no longer useful in the taxpayer's trade or business or in the production of his income and is to be retired from service by the taxpayer. * * * If the taxpayer's policy is to dispose of assets which are still in good operating condition, the salvage value may represent a relatively large proportion of the original basis of the asset. * * * "

Finally, for the guidance of taxpayers, there are now official definitions of the terms "useful life" and "salvage value", and definite rules for their application.

There can be no dispute over the fact that the Tax Court applied to the facts of this case definitions of "useful life" and "salvage value" which appeared for the first time in Regulations T.D. 6182, promulgated under the 1954 Code. The Commissioner does not seriously argue otherwise. His position appears to be that the concepts of "useful life" and "salvage value" embodied in the new regulations have been applied under all Revenue Acts and regulations since 1918, including the Internal Revenue Code of 1939, and regulations issued thereunder. The petitioner vigorously disputes such position.

We will now proceed to explore the validity of the petitioner's contention

that until the opinion of the Tax Court herein, judicial interpretation, administrative practice under the 1939 Code, and practice in the accounting profession, had long agreed that, for the purpose of the depreciation deduction, the term "useful life" means the physical or economic life of the property subject to the depreciation allowance, and that the term "salvage value"—the value remaining in depreciable property at the end of its physical or economic life—means its residual or scrap value.

The basic statute on depreciation in the Internal Revenue Code of 1939 is section 23, 26 U.S.C.A. § 23. This section in its relevant part provides: "§ 23. Deductions from gross income. In computing net income there shall be allowed as deductions * * * (*l*) Depreciation. A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—(1) of property used in the trade or business, or (2) * * *"

This basic provision relating to depreciation of property used in a trade or business has been a part of every Internal Revenue Act since 1918.[2] This same basic provision appears in the Internal Revenue Code of 1954.[3]

In none of the depreciation provisions contained in revenue acts from the Revenue Act of 1918 has Congress seen fit to define the term "reasonable" in providing for a "reasonable allowance" for exhaustion, wear and tear. This basic provision is so general as to render an interpretative regulation appropriate. Morrissey v. Commissioner of Internal Revenue, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263; Helvering v. R. J. Reynolds Tobacco Co., 306 U.S. 110, 59 S.Ct. 423, 83 L.Ed. 536.

Treasury Regulations 111 (1942) were promulgated under the Internal Revenue Code of 1939, and are applicable to the years 1950 and 1951, which are the taxable years under review. The relevant

portions of Regulations 111 are contained in section 29.23(1). Pertinent extracts from such section are: " * * * The proper allowance for such depreciation is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan (not necessarily at a uniform rate), whereby the aggregate of the amounts so set aside, plus the salvage value, will, at the end of the useful life of the depreciable property, equal the cost or other basis * * *" Section 29.23(1)-1.

"The capital sum to be replaced by depreciation allowances is the cost or other basis of the property in respect of which the allowance is made. * * *" Section 29.23(1)-4.

"The capital sum to be recovered shall be charged off over the useful life of the property, either in equal annual installments or in accordance with any other recognized trade practice, * * * The deduction for depreciation in respect of any depreciable property for any taxable years shall be limited to such ratable amount as may reasonably be considered necessary to recover during the remaining useful life of the property the unrecovered cost or other basis. * * *" Section 29.23(1)-5.

The first appearance of the terms "useful life" and "salvage value" in Treasury Regulations was in Treasury Regulations 45, Article 161 (1919), effective for the calendar years 1918–19 and 1920. Article 161 provided in part, as follows: "The proper allowance for such depreciation of any property used in the trade or business is that amount which should be set aside for the taxable year in accordance with a consistent plan by which the aggregate of such amounts for the *useful life of the property in the business* will suffice, with the salvage value, at the end of such useful life to provide in place of the property its cost * * *" (Emphasis added)

2. Sec. 214(a) (8) and Sec. 234(a) (7) of the Revenue Act of 1918, c. 18, 40 Stat. 1057, 1067, 1078.

3. Sec. 167, Title 26 U.S.C.A.

Article 165 of the same Regulations provided in part, as follows: "The capital sum to be replaced *should be charged off over the useful life of the property* \* \* \*" (Emphasis added)

Similar wording with changes not material to the problem before us appeared in subsequent Treasury Regulations through Regulations 103, Section 12.23 (1)–1–5, effective for the tax years 1939–40 and 1941. The words "in the business" which appeared in Article 161 of Regulations 45 continued to appear in successive regulations until the issuance of Regulations 111 in 1942. No definition or further explanation of the terms "useful life" or "salvage value" appeared in any of the regulations to which reference has been made until the issuance of Treasury Regulations T.D. 6182, promulgated under the 1954 Revenue Code. The terms "useful life" and "salvage value" are not defined or explained in Regulations 111. The language of the Regulations does not limit "useful life" to the useful life of the depreciable assets in the business of the taxpayer or to the period during which such assets are held by the taxpayer.

The significance, if any, to be attached to the omission of the words "in the business" from Regulations 111 is obscure. We attach no significance thereto because in our view the practice and position of the Commissioner has been the same under Regulations 45 and succeeding regulations up to T.D. 6182, except for a few recent cases under Regulations 111 of the Internal Revenue Code of 1939, [4] in which the Commissioner asserted the concepts of "useful life" and "salvage value" embodied in T.D. 6182.

From the practice of the Commissioner over the years, it appears to us that the phrase "in the business" included in earlier regulations simply defined the type of assets which were subject to the depreciation allowance. The omission of such phrase from Treasury Regulations 111 would not furnish the basis for an interpretation of the term "useful life" which it did not have when the phrase appeared in the regulations.

■ As stated above, the basic statutory provision relating to depreciation of property used in a trade or business was so general as to render an interpretative regulation appropriate. Section 3791 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 3791 states that the Commissioner, with the approval of the Secretary, "shall prescribe and publish all needful rules and regulations for the enforcement of this title." Pursuant to such Congressional direction, the Commissioner issued Regulations 111, of which section 29.23(1) is a part. This section was prepared by the department charged with the enforcement of the Act. In carrying out the Congressional directive, it was necessary for the Commissioner to select some base on which the annual allowance for depreciation might be measured. The language in section 29.23(1) indicates that the Commissioner selected as the base the estimated physical or economic life of the depreciable asset, and not the estimated holding period of such asset in the hands of the taxpayer. The section represents a fairly contemporaneous construction by the Commissioner of the statute. The Section is not in conflict with the express provisions of the statute. It is reasonably adapted to the enforcement of the Act. If there exists any doubt as to the construction to be placed on the language of section 29.23(1), such doubt disappears in the light of the consistent practice and position of the Commissioner from 1939 to 1956. No decision of the United States courts or the Tax Court has been called to our attention, except the very recent decisions heretofore mentioned, in which the Commissioner asserted that the term "useful life" should be limited to the period during which the depreciable asset was held by the taxpayer. On the contrary, the consist-

4. Koelling v. United States, D.C.Neb. 1957, 171 F.Supp. 214; Pilot Freight Carriers Inc. vs. Commissioner (1956),

15 Tax Court Memo 1027; the instant case (1957), 16 CCH, Tax Court Memo 156.

ent, long-continued practice and position of the Commissioner were that "useful life" of the depreciable asset was its estimated physical or economic life.

Our attention has been directed to certain pronouncements of the Commissioner dealing with the general subject under review.[5] In each of such pronouncements, it is evident that the Commissioner's concept of the term "useful life" was not measured by the period in which the depreciable asset was useful in the taxpayer's business, but was measured rather by the economic or physical life of the depreciable asset.

Further evidence of the position of the Commissioner is drawn from his acquiescence in decisions of the Board of Tax Appeals[6] which measured "useful life" of the depreciable asset not by the holding period of such asset by the particular taxpayer, but by the economic or physical life of such asset.

In the case of General Securities Co. v. C. I. R., BTA Memo., CCH Dec. 12,500–D (1942), affirmed per curiam, 6 Cir., 137 F.2d 201, the taxpayer claimed a useful life of three years for automobiles used in its business. The taxpayer kept its cars one or two years, and when traded in after one year the cars retained a value of from one-third to one-half of their original value. The Commissioner attempted to compel the taxpayer to depreciate such automobiles over a useful life of more than three years. The Tax Court found that the normal useful life of such automobiles was three years.

In the recent case of Philber Equipment Corp. v. Commissioner of Internal Revenue, 3 Cir., 1956, 237 F.2d 129, taxable years 1951–52 were involved. The taxpayer was engaged in the business of furnishing trucks, trailers and tractors to the public on a lease basis. The single issue in that case was whether the motor vehicles owned by taxpayer were "held 'primarily for sale to customers in ordinary course of petitioner's trade or business'" within the meaning of Section 117(a) and (j) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 117 (a) and (j). The court stated at page 130: "During the taxable years, existing conditions made it difficult or impossible to re-lease most of the equipment. Taxpayer knew that when equipment was purchased, it would probably be able to rent the equipment for a period substantially less than its useful life, and sale of the equipment would follow expiration of a lease." The Commissioner stated in his brief[7] filed in that case, "Because of existing conditions taxpayer knew when it purchased equipment that it would likely be able to rent such equipment only for a period that was substantially less than its useful life." (Page 5 of brief). At page 11 of the brief, the Commissioner stated, " * * * all of the leases involved were only for a one-year term, a period substantially less than the useful life of this type of equipment as its resale in the tax years and re-lease in later years demonstrated." The statements of the Commissioner in the above case are simply confirmatory of the position taken by the Commissioner over a period of many years.

Petitioner calls attention to Internal Revenue Bulletin "F", which was issued in 1920 and revised in 1942. It was republished as Internal Revenue Bulletin 173 in 1955. This bulletin sets forth general depreciation policy and tables of estimated lives of particular kinds of assets. This bulletin is titled "Income Tax Depreciation and Obsolescence, Estimated Useful Lives and Depreciation Rates." The title page states, "This bulletin supersedes Bulletin 'F' (revised

---

5. O.D. 845, Cumulative Bulletin—January–June 1921, page 178. I.R.Bulletin 108, 1953–1 CB 185; and Rev.Rul. 54–229, 1954–1 CB 124.

6. Sanford Cotton Mills, 1929, 14 B.T.A. 1210, Acq. X–2 CB 63; Appeal of Merkle Broom Co., 1926, 3 B.T.A. 1084, Acq. V–2 CB 2; Kurtz, 1927, 8 B.T.A. 679, Acq. VII–1 CB 18.

7. Brief of respondent, Philber Equipment Corp. v. Commissioner of Internal Revenue, 3 Cir., Docket No. 11,860.

January 1931) and 'Depreciation Studies' (published January 1931. It contains information and statistical data relating to the determination of deductions for depreciation and obsolescence, from which taxpayers and their counsel may obtain the best available indication of Bureau practice and the trend and tendency of official opinion in the administration of pertinent provisions of the Internal Revenue Code and corresponding or similar provisions of prior Revenue Acts. It does not have the force and effect of a Treasury Decision and does not commit the Department to any interpretation of the law which has not been formally approved and promulgated by the Secretary of the Treasury."

In the first paragraph of the Introduction (Part I, page 1 of the Bulletin) it is stated: "The Federal income tax in general is based upon net income of a specified period designated as the taxable year. The production of net income usually involves the use of capital assets which wear out, become exhausted, or are consumed in such use. The wearing out, exhaustion, or consumption usually is gradual, extending over a period of years. It is ordinarily called depreciation, and the period over which it extends is the normal useful life of the asset."

The first paragraph on page 3, under the heading "Probable Useful Life—Rates of Depreciation and Obsolescence" is as follows: "In general.—The amount of the annual deduction allowable for depreciation is ordinarily dependent upon the expected useful life of the asset. The factors which determine the useful life of property in a trade or business have already been discussed briefly in the Introduction. These factors are wear and tear and decay or decline from natural causes; and also various forms of obsolescence attributable to the normal progress of the art, economic changes, inventions, and inadequacy to the growing needs of the trade or business. Two principal forms or types of obsolescence are generally recognized, that is, normal obsolescence and extraordinary special obsolescence."

At page 7, under the heading of "Salvage" it is stated: "Salvage value is the amount realizable from the sale or other disposition of items recovered when property has become no longer useful in the taxpayer's business and is demolished, dismantled, or retired from service. * * * "

Under the heading "Lives of Depreciable Property" is the following: "In this compilation are listed for each industry the useful lives of various assets, including wherever practicable lives for composite accounts and group accounts. * * * All lives are given without fractional years. In practice, however, fractions may be used."

The recommended useful life on motors and other vehicles appears on page 52. Therein it is stated, "Motor vehicles included in this classification are those used by commercial enterprises other than public utility and construction.

Lives considered reasonable are indicated below:

| Automobiles: | Years |
|---|---|
| Passenger | 5 |
| Salesman | 3 *. * *" |

In the instant case, as noted above, the petitioner used a useful life of four years in his depreciation schedules.

While we recognize that Bulletin "F" does not have the force of law, we do believe that a fair construction of the pertinent provisions of such Bulletin, aided by the practice of the Commissioner, reasonably indicates that the Commissioner did not consider as a factor in determining depreciation the expected or intended disposal plans of the taxpayer with respect to property used in his trade or business, nor did the Commissioner consider that the useful life of an asset was to be measured by the estimated holding period of such asset by the taxpayer.

Decisions of the Board of Tax Appeals and the Tax Court [8] extending over many years have, but with little discussion, measured the useful life of a depreciable asset used in the trade or business of the taxpayer not by the holding period of such asset by a particular taxpayer but by the economic or physical life of such asset.

In a recent decision of the United States District Court [9] involving the same tax years as in the instant case, the same type of business, and the same disposal practice as to automobiles, the court upheld the taxpayer's depreciation practice based on a useful life of three years. Similar holdings were made in district court cases.[10]

In Hertz Corporation, etc. v. United States, supra, the litigation arose under the Internal Revenue Code of 1954, the tax years involved being the years ending March 31, 1954, 1955 and 1956. The district court refused to apply the concept of "useful life" set forth in T.D. 6182 to taxable years prior to the promulgation of such regulations. The court stated [165 F.Supp. 275]: "The final question is whether or not, under the circumstances, the Commissioner may apply these regulations retroactively to include years prior to their promulgation. Retroactive laws are not favored. Long prior to the issuance of the new regulations in 1956, the Commissioner by his pronouncements and conduct had apparently acquiesced in the construction of 'useful life' given to the phrase by business and accounting circles and had been permitting taxpayers to make use of the declining-balance method of depreciation in situations similar to this. Nor did the language of the regulations (prior to that now under consideration)

give any indication that the hitherto long-settled interpretation of the term would be changed. Furthermore, when the words 'useful life of the depreciable property' were inserted in the Regulations in 1942, they were capable of the construction that 'useful life' meant the whole physical life of the property.

"Taxpayers had a right to file their returns in reliance upon the Commissioner's long-continued interpretation of his own Regulations. Here a new regulation has been promulgated defining the term 'useful life' pursuant to a statute which for the first time has employed the term and where the intention of Congress with respect to its definition is clearly contrary to the interpretation, as evidenced by conduct and frequent pronouncements, which the Commissioner has given it in the past. Common justice requires that it be given a prospective construction only. * * * "

The long-continued and consistent practice and position of the Commissioner in measuring useful life by the physical or economic life of the depreciable asset were reflected in testimony before the Tax Court. At the trial in the Tax Court, two witnesses testified on behalf of petitioner. Both were certified public accountants licensed to practice their profession in several states, and both were admitted to practice before the Treasury Department. Each was a member of a separate accounting firm which practiced accounting nationwide. Each witness stated that he had had experience representing taxpayers before the Internal Revenue Service on depreciation matters. One witness had practiced his profession since 1930, and the other since 1934. Both testified that in the accounting profession the term "useful

---

8. West Virginia & Pennsylvania Coal & Coke Co., 1925, 1 B.T.A. 790; Appeal of James, 1925, 2 B.T.A. 1071, Acq. V–1 CB 3; Kay, 1928, 10 B.T.A. 534, Acq. VII–1 CB 17; W. N. Foster, et al., 2 TCM 595 (1943); John A. Maguire Estate, Ltd., 1929, 17 B.T.A. 394, Acq. IX–1 CB 34; Nat Lewis, 13 TCM 1167

(1954); and Whitman-Douglas Co., 1927, 8 B.T.A. 694.

9. Massey Motors, Inc. v. United States of America, D.C.Fla.1957, 156 F.Supp. 516.

10. Davidson v. Tomlinson, D.C.Fla.1958, 165 F.Supp. 455; Lynch-Davidson Motors, Inc. v. Tomlinson, D.C.S.D.Fla. 1958, 172 F.Supp. 101.

life" for depreciation purposes denoted the physical life or economic life of a particular asset, and that the term "salvage value" denoted the junk or scrap value of an asset at the expiration of its useful life. Both testified that in their experience in dealing with the Internal Revenue Service prior to 1954, on the subject of depreciation, the practice of the Internal Revenue Service was to apply the same concepts of such terms as such concepts were generally understood in the accounting profession. The respondent offered no testimony on the subject. The Tax Court stated, in admitting such evidence, that such testimony was not controlling.

■ In light of the language of Section 29.23(1), the consistent practice and position of the Commissioner over many years, the interpretation placed on the term "useful life" by decisions of the Tax Court extending over a long period, we hold that under the Internal Revenue Code of 1939 the Tax Court erred when it measured useful life of the depreciable assets involved here by the period during which such assets were held in the business of petitioner instead of the physical or economic life of such assets. The application by the Tax Court of an erroneous concept of "useful life" necessarily requires a re-determination by the Tax Court of "salvage value". The Tax Court determined salvage value to be the estimated proceeds which would be realized from such assets when they were no longer useful in the business of petitioner and were to be disposed of by him, instead of the estimated proceeds which would be realized upon the sale or other disposition of such assets at the end of their physical or economic life. We do not agree with the petitioner's contention that the value remaining in such assets at the end of their physical or economic life necessarily means scrap or junk value. Initially, petitioner should have estimated salvage value upon acquisition of such assets and such value should have been adjusted at the end of each taxable year if conditions then existing reasonably

indicated that a different value would probably be realized at the end of the physical or economic life from the sale or other disposition of such assets.

The period over which useful life— meaning the physical or economic life— extends and the salvage value at the end of such period are questions of fact to be determined by the Tax Court on the remand of this cause.

In support of the decision of the Tax Court, the Commissioner argues, inter alia, that obsolescence was the principal factor in the depreciation of petitioner's automobiles, and that the depreciation deduction must be based upon and take into consideration obsolescence as well as exhaustion caused by physical wear and tear. The cogency of such observation is not clear to us unless the Commissioner intends to suggest that petitioner should have but failed to claim depreciation based on obsolescence in addition to claiming depreciation caused by exhaustion through wear and tear. No meaningful mention of the word "obsolescence" appears in the findings, conclusions, decision of the Tax Court, or elsewhere in the record.

■ Regulations 111 covering the taxable years here in issue provide in section 23.23(1)–6, in part: "With respect to physical property the whole or any portion of which is clearly shown by the taxpayer as being affected by economic conditions *that will result in its being abandoned at a future date prior to the end of its normal useful life,* so that depreciation deductions alone are insufficient to return the cost or other basis at the end of its economic term of usefulness, a reasonable deduction for obsolescence, in addition to depreciation, may be allowed in accordance with the facts obtaining with respect to each item of property concerning which a claim for obsolescence is made." (Emphasis added) There is no evidence in the record which suggests that obsolescence is a factor which should be considered in this case. The foundation for obsolescence is, according the the Regulations, the expected early abandonment of the proper-

ty. The term "abandon" has been held not to include property which was to be sold at a time when it had substantial value and was to be used for other purposes instead of being scrapped. Olean Times-Herald Corporation, 1938, 37 B.T. A. 922; Southeastern Building Corporation, v. C. I. R., 1944, 3 T.C. 381, affirmed 5 Cir., 148 F.2d 879, certiorari denied 326 U.S. 740, 66 S.Ct. 52, 90 L.Ed. 442; Bradley v. C. I. R., 7 Cir., 184 F.2d 860.

The Commissioner also asserts that the decision of the Tax Court must be affirmed because petitioner is not entitled to convert ordinary income into capital gain through the depreciation deduction, and that section 117(j) of the Internal Revenue Code of 1939, which permitted capital gain upon the sale or exchange of certain property used in a trade or business, must be applied in such a manner that only a "reasonable allowance" for depreciation be deducted.

■ In his deficiency notice the Commissioner stated: "It is further held that you were also in the business of selling used automobiles during the years 1950 and 1951. Consequently, the profit realized from the sale of the automobiles was income from the sale of property held primarily for sale in the ordinary course of your business within the meaning of section 117(j) of the Internal Revenue Code and such income may not be treated as a capital gain under the above-mentioned section of the Code. * * * " The Commissioner abandoned that issue in his brief filed with the Tax Court and conceded the right of petitioner, under section 117(j), to treat the sales of his automobiles as sales of property used in his trade or business, not held primarily for sale to customers in the ordinary course of business. The Commissioner's abandonment of this approach was probably influenced by the decision of Philber Equipment Corp. v. Commissioner of Internal Revenue, supra. That case involved the same type of business in which petitioner engages and with similar disposal practices of automobiles. The court held, since the circumstances disclosed that the acqui-

sition, use and disposition of taxpayer's vehicles was consistent with business purposes of vehicle rental, that his vehicles were not held primarily for sale to customers, and thus the gain from the sale of such vehicles was not ordinary income but was capital gain and was taxable as such.

■ The argument is not convincing in the light of the long-continued and consistent practice of the Commissioner outlined above, which led taxpayers to adopt a method of depreciation which the Commissioner now contends results in unreasonable deductions for depreciation, and the legislative history of section 117(j). In amending, in 1942, section 117 of the Internal Revenue Code of 1939 by adding sub-section (j), Congress extended to taxpayers who sold at a profit depreciable assets used in a trade or business, held for more than six months, and not held primarily for sale to customers in the ordinary course of business, the favorable treatment on such profits accorded to capital gains. The legislative history of section 117(j) shows that Congress has not receded from its original purpose. Congress was aware of the Commissioner's contention that taxpayers were converting into capital gains ordinary income arising from unreasonable deductions for depreciation.

Congress and the Treasury Department were well aware of the losses in revenue occurring under section 117(j). The report of the Business Tax Section of the Division of Tax Research of the Treasury Department submitted to the Ways and Means Committee of the House of Representatives (see "Revenue Revisions," 1947–1948, hearings of December 2–12, 1947, Part 5, page 3756) contained warnings against revenue losses through the benefits of capital gain treatment of profits from sale of assets subject to accelerated depreciation, and recommended that if the taxpayer elects to use accelerated depreciation, gains to the extent of the excess of accelerated over normal depreciation should be treated as ordinary income. Congress took no action. In 1950 the Treasury

Department recommended to Congress that losses on the sale of depreciable business assets be treated as capital rather than ordinary losses (see Committee Reports on HR–8920, 81st Congress, Second Session). Again Congress did not act. On April 19, 1954, the Committee on Federal Taxation of the American Institute of Accountants filed with the Senate Finance Committee its recommendation number 180, with respect to section 1231 of the proposed Internal Revenue Code of 1954, 26 U.S. C.A. § 1231, as follows: "Gain or loss of property used in the trade or business, etc.; should be treated uniformly as ordinary income or loss." [11] The recommendation was heard but not adopted.

In the Revenue Code of 1954, Congress limited capital gains on sales of emergency facilities amortized under section 168, but did not limit capital gains upon the sale of assets used in a trade or business. The House report [12] states, with respect to section 1231, "This section is derived from section 117(j) of the present law. There is no substantive change intended but some rearrangement has been made."

The Commissioner contends that to define "useful life" as the physical or economic life of a depreciable asset does violence of the Congressional intent expressed in the basic statute that there shall be allowed as a deduction from gross income "a reasonable allowance for exhaustion, wear and tear * * * of property used in the trade or business * * *" and is contrary to the theory underlying such allowance that the yearly depreciation deduction reasonably reflect that portion of the value of the capital assets consumed in earning the gross income for the taxable year, citing

United States v. Ludey, 274 U.S. 295, 47 S.Ct. 608, 71 L.Ed. 1054; Virginia Hotel Co. v. Helvering, Commissioner of Internal Revenue, 319 U.S. 523, 63 S.Ct. 1260, 87 L.Ed. 1561; Detroit Edison Co. v. Commissioner of Internal Revenue, 319 U.S. 98, 63 S.Ct. 902, 87 L.Ed. 1286.

Again, the Commissioner overlooks the force of his own regulations, his long-continued, consistent practice thereunder, and the Congressional intent expressed in the enactment and subsequent legislative history of section 117(j).

■ Finally, the Commissioner contends that the findings of fact of the Tax Court that the short term rental cars had a useful life of 17 months and the long term rental cars had a useful life of three years each, and that each car of each class had a value of $1,325 and $600 respectively, must be accepted by this Court unless clearly erroneous. Such findings are conclusions of law, legal inferences from the evidentiary facts or, in any event, determinations of questions of law and fact. They were arrived at by the application of erroneous concepts of the terms "useful life" and "salvage value". Under such circumstances we are not bound by the "clearly erroneous" rule. Curtis v. Commissioner of Internal Revenue, 3 Cir., 232 F.2d 167; Helvering v. Tex-Penn Oil Co., 300 U.S. 481, 57 S.Ct. 569, 81 L.Ed. 755.

The decision of the Tax Court is reversed and the cause remanded to the Tax Court for further hearing and proceedings for the redetermination of the tax liability of petitioners in a manner consistent with the views expressed herein.

11. Hearings before the Committee on Finance, U.S. Senate, 83rd Congress, Second Session, on HR–8300, Part 3, page 1324.

12. Page 275 of House Report No. 1337, 83rd Congress, Second Session. U.S. Code Congressional and Administrative News 1954, p. 4025.