Fribourg Navigation Company, Inc. v. Commissioner.
Fribourg Navigation Co. v. Commissioner
Docket No. 88182.
United States Tax Court
T.C. Memo 1962-290; 1962 Tax Ct. Memo LEXIS 18; 21 T.C.M. (CCH) 1533; T.C.M. (RIA) 62290; December 10, 1962
*18 Held: Claimed depreciation deduction on an asset disallowed for taxable year in which the asset was sold at a price substantially in excess of its undepreciated cost as of the beginning of the taxable year. Randolph D. Rouse, 39 T.C. , (October 10, 1962), followed. James B. Lewis, Esq., 2 Broadway, New York, N. Y., and Theodore Ness, Esq., for the petitioner. Edward H. Hance, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner determined an income tax deficiency for 1957 in the amount of $71,430.97. The question is whether petitioner is entitled to deduct depreciation of an asset used in its business during most of 1957, which was sold at the end of that year at a profit. The asset was sold for an amount which exceeded its depreciated cost at the beginning of the year. Respondent disallowed depreciation for the last period of use of the asset in the amount of $135,367.24. Findings of Fact The stipulated facts are found as stipulated and are incorporated herein by this reference. The petitioner had its principal place of business in New York City. It kept its books and filed its returns on the basis of a calendar year and an accrual method of accounting. *20 Its return was filed with the district director of internal revenue for the District of Lower Manhattan. Petitioner was organized on February 15, 1946, and was dissolved on January 17, 1958, pursuant to a plan of liquidation adopted in 1957 which came within the provisions of section 337 of the 1954 Code. During 1957 and before, petitioner's business was the operating of ships, which it owned, in foreign commerce under charters from those having dry, bulk cargoes for shipment. In 1957 petitioner owned and operated two ships, only, the Flying Foam and the Joseph Feuer. The Flying Foam is a CIB type steam turbine, dry cargo vessel, a faster ship of better engine type than the Feuer. The Feuer is a Liberty-type dry cargo ship. The issue presented relates to the Feuer. The Feuer was constructed in 1943 for the United States Maritime Commission for emergency use during World War II. On December 21, 1955, petitioner purchased the Feuer from Drytans, Inc., for cash in the amount of $469,000. Petitioner's use of this ship is set forth hereinafter. Before buying the Feuer, petitioner's attorney applied for and received a letter-ruling, dated December 8, 1955, from the engineering *21 and valuation branch of the Internal Revenue Service with respect to depreciation of the ship under the straight line method of depreciation, as follows: Petitioner was advised that the Internal Revenue Service would accept a "useful economic life" of 3 years from the date of acquisition; a salvage value of $54,000. computed on the basis of $5 per dead weight ton for 10,800 tons; and that the cost of $469,000, less the salvage value, should be spread ratably over a period of 3 years from the date of acquisition. The ruling also stated that it should be understood that the cost of the ship would be subject to check by the office of the district director, that the estimated remaining useful life was "subject to such change as subsequent experience may warrant," and that the ruling was not to be construed as an agreement within section 167(d) of the 1954 Code. Acting in accordance with the ruling, petitioner computed depreciation of the Feuer on the basis of $415,000 (cost less salvage value of $54,000) which it spread over a 3-year useful life from December 21, 1955, to December 21, 1958, under the straight line method. This resulted in depreciation at a daily rate of about $378.65 *22 ($378.64963) over a period of 1,096 days. If petitioner had owned and used the ship for 3 years from the date of purchase to December 21, 1958, and if the above ruling with respect to allowable depreciation had not been changed, petitioner would have computed annual depreciation about as follows: Year
Days of Use
Depreciation
1955
10 days
$ 3,786.50
1956
366 days
138,585.77
1957
366 days
138,585.77
1958
354 days
134,041.96
1,096 days
$415,000.00
Petitioner, in fact, claimed a deduction for depreciation of the Feuer on the above basis for 10 days in 1955 and all of 1956 in the respective amounts of $3,786.50 and $138,585.77. Upon audit of its returns for those years the depreciation deductions were allowed by the respondent. The total depreciation allowed for 1955 and 1956 amounted to $142,372.27; and the depreciated cost of the Feuer at the beginning of 1957 was $326,627.73. The Internal Revenue Service did not change the ruling of December 8, 1955, relating to useful economic life and salvage value of the Feuer. The Suez Canal in normal times is the busiest interocean canal in the world. Under an international convention made in 1888, the *23 Canal was to be open to all nations. Prior to 1956 a commission composed mostly of British and French nationals directed the management of the Canal. On June 13, 1956, Great Britain ended its 74-year military occupation of the canal area pursuant to an agreement with Egypt. On July 26, 1956, Egypt seized the Canal. Israel invaded Egypt on October 29, 1956, and two days later Great Britain and France attacked Egypt in an effort to restore international control of the Canal. During the hostilities the Canal became blocked by sunken vessels. The fighting was ended on November 7, 1956, by United Nations action. The United Nations sent a police force to maintain peace in the canal area; it aided in salvage operations necessary to clear the canal. The canal was reopened for full-time use on March 29, 1957, under Egyptian management. Because of the blockage of the Suez Canal, ships had to take the longer routes to places otherwise reached by going through the Canal. There was a resulting scarcity of available ships to carry cargoes. Also, European governments, anticipating a long delay in the opening of the Canal, began stockpiling oil and other commodities. There were resulting increases *24 in charter rates, which reached a peak in January and February of 1957, and the scarcity of ships caused sales prices of ships to rise sharply. In January and February of 1957, purchasers were willing to pay as much as $1,000,000 for American flag Liberty-type ships. In June of 1957 the president of Isbrandtsen Company Inc. approached the petitioner about the possible purchase of the Feuer, although petitioner had not put the ship up for sale. Like the petitioner, Isbrandtsen Company used Liberty-type ships in its business. Petitioner received the offer of an excellent price for the Feuer and for that reason decided to sell the ship, although petitioner had used it in its business for only about 18 months. On June 14, 1957, petitioner entered into a contract for the sale of the Feuer to the Isbrandtsen Company for $700,000, payable $350,000 in cash at the time of the closing, $175,000 six months later, under a 5 percent note; and $175,000 one year later, under a 5 percent note. The contract called for delivery of the ship during December 1957. As of June 14, 1957, there had been an appreciation in the value of the Feuer due to economic and market conditions. After entering *25 into the contract, Isbrandtsen Company, on the same day, assigned all of its contractual rights to a New York City partnership, Long, Quinn & Boylan Co., which is engaged in the business of acting as a broker for ship owners and persons desiring to charter ships. Long, Quinn & Boylan did not operate the Feuer; they chartered the ship to Isbrandtsen Company. On December 23, 1957, petitioner delivered the Feuer to Long, Quinn & Boylan at Hoboken, New Jersey. On the same day the contract of sale was modified; Long, Quinn & Boylan paid petitioner $695,500 for the ship; $625,000 was paid in cash; $70,000 was to be paid one year later under a 5 percent note. As of December 23, 1957, petitioner had used the Feuer in its business for two years, i.e., one year less than the period of three years, the useful economic life of the ship which was estimated at the time of acquisition in 1955. Petitioner continued to own its other ship, the Flying Foam. Petitioner's past experience did not show that it followed a practice of buying and then selling ships after a short period of use. In its income tax return for 1957, petitioner deducted depreciation of the Feuer for 357 1/2 days, the period *26 during which it had used the ship in its business up to the time of delivery to the purchaser. Petitioner deducted $135,367.24 for depreciation which was computed in the same way as for prior periods of use. The respondent disallowed in full the depreciation deduction. In the statutory deficiency notice the only explanation given for the denial of the deduction was that the petitioner "was not entitled to depreciation * * * under the applicable provisions of the Internal Revenue Code of 1954." In its return for 1957, petitioner reported gross profit after costs of operations in the amount of $391,811.31, of which amount about $289,340 represented gross profit from the operation of the Feuer. Petitioner reported taxable income, after the depreciation deduction of $135,367.24, in the amount of $141,193.35. On March 7, 1957, prior to the sale of the Feuer, petitioner adopted a plan of complete liquidation to be completed within a period of 12 months. Petitioner carried out the plan within 12 months. All of its assets, less those retained to meet claims, were distributed to its stockholders in redemption of stock, including the proceeds from the sale of the Feuer. Since the plan *27 of liquidation came within the scope of section 337, no gain or loss to petitioner was recognized from its sale of the Feuer within the 12-month period. For information purposes only petitioner reported the sale of the Feuer at a profit in its income tax return for 1957. Petitioner reported gain, after total depreciation of $277,739.51 (including depreciation for 357 1/2 days in 1957 of $135,367.24), in the amount of $504,239.51. From December 21, 1955, to December 23, 1957, the Feuer was operated under the American flag as a tramp ship, without a regular schedule. It was operated under 6 charters carrying either grain, sugar, fertilizer, or scrap iron from the United States to Korea, Japan, Morocco, Egypt, Israel, and India. Return voyages were made without cargoes, but such arrangement did not involve any loss because of foreign aid program payments made by the United States. At the end of 1957, there were only about 88 Liberty-type ships which were privately owned and operated under the American flag; 70 were operated as tramp ships. Liberty ships have a speed of about 10 knots and a cubic capacity of about 475,000 feet. Modern cargo ships, built after the war, are superior, *28 having a speed of 14 to 18 knots and cubic capacity of about 600,000 feet. In postwar commerce, Liberty ships carried low-paying bulk commodities, principally grain and coal. After the Suez Canal crisis, tankers built during the crisis began carrying grain in competition with American flag Liberty ships. By the end of 1957, charter rates had fallen sharply from the high levels they had reached during the Suez crisis. This sharp drop in charter rates resulted from the reopening of the Canal, the diminishing of world tension, the entry into the market of large modern vessels, and the realization by the European governments that they had overstocked commodities. The above-described movements in charter rates are reflected in the voyage charter fixtures (i.e., contracts for the shipment of goods) published weekly by Maritime Research, Inc. That publication shows the following rates, in dollars per long ton, for voyage charters of American flag Liberty-type ships for the shipment of heavy grain during the last quarter of 1955, the first quarter of 1957 (the peak of the Suez crisis), and the first quarter of 1958: Trade Route
Oct.-Dec. 1955
Jan.-Mar. 1957
Jan.-Mar. 1958
U.S. Gulf - Pireaus
High
18.00
High
20.85
14.50
Low
16.50
Low
19.00
North Pacific - Korea
High
17.00
High
18.50
High
13.00
Low
16.35
Low
18.43
Low
11.00
North Pacific - Formosa
15.85
High
20.25
13.00
Low
18.50
*29 Charter rates for American flag Liberty-type ships were substantially lower during the last two quarters of 1957 than they had been during the second quarter of that year when the petitioner had contracted to sell the Feuer. This is reflected in the following rates published by Maritime Research, Inc. for voyage charters of such ships for the shipment of heavy grain or barley (the rate for which is slightly higher than the rate for heavy grain): Trade Route
Apr.-June 1957
July-Sept. 1957
Oct.-Dec. 1957
U.S. Gulf - Haifa
19.25
14.00
High
15.00
Low
14.25
North Pacific - Korea
High
14.75
High
13.20
High
11.50
(barley)
(barley)
Low
14.00
Low
11.50
Low
11.25
(barley)
North Pacific - Japan
High
13.75
10.85
High
10.75
Low
13.35
Low
10.35
North Atlantic - Poland
13.85
12.00
High
13.25
Low
12.80
By the last quarter of 1957, when petitioner delivered the Feuer to its new owner, charter rates for American flag Liberty-type ships were significantly lower than they had been in the last quarter of 1955 when petitioner had purchased the Feuer. This is reflected *30 in the following comparison of rates published by Maritime Research, Inc. for voyage charters of such ships for the shipment of heavy grain or barley: Oct.-Dec.
Oct.-Dec.
Trade Route
1955
1957
U.S. Gulf - Haifa
19.00
High
15.00
Low
14.25
North Pacific - Korea High
17.00
High
11.50
Low
16.35
(barley)
Low
11.25
U.S. Gulf - Karachi High
24.95
21.10
Low
23.40
North Pacific - For-
mosa
15.85
13.00
During the Suez crisis, the United States government encouraged independent owners to build tankers by providing them with extensive financing guarantees. An owner was able to build a tanker with only 12 1/2 percent cash, with the balance payable over 20 years and guaranteed by the Government. During 1957 19 independently owned American flag tankers ranging in dead weight tonnage from 26,500 tons to 67,000 tons were contracted for or under construction. These 19 tankers had a total dead weight tonnage of 731,273 tons, which about equals the total dead weight tonnage (approximately 700,000 to 800,000 tons) of the 70 or so Liberty-type ships trading as tramp vessels under the American flag. These tankers had a speed of about *31 15 1/2 to 16 knots, much faster than the Liberty-type ships. During the Suez crisis, when these tankers were ordered, the charter rates for oil were high and remunerative. However, by the end of 1957 this was no longer true, and the surplus American flag tankers had begun to carry grain. The American flag tankers, having greater tonnage and speed, were able to carry grain at lower rates than American flag Liberty-type ships. The rates, in dollars per long ton, published by Maritime Research, Inc. for voyage charters of American flag tankers and American flag Liberty-type ships for the shipment of heavy grain for the same week and same trade route are compared below: Liberty-type
Trade Route
Week Ending
Tanker Rate
Ship (Rates)
U.S. Gulf - Poland
Sept. 14, 1957
12.50
13.40; 13.50
U.S. Gulf - Trieste
Nov. 2, 1957
13.50
15.35
U.S. Gulf - Karachi
Feb. 2, 1958
17.85
24.25
U.S. Gulf - Turkey
Apr. 4, 1958
11.95
15.50
By the end of 1957, the business of shipping coal, which had been one of the two principal commodities carried by American flag Liberty-type ships, had about disappeared because of the world-wide increase in oil consumption. *32 By December of 1957, when the petitioner delivered the Feuer to the purchaser, prices for such ships had fallen to the level of from $400,000 to $500,000. On December 13, 1957, the United States Maritime Administration sold 9 Liberty-type ships for scrapping under a previously extended invitation for bids. Eight of these 9 vessels were sold at prices ranging from $83,000 to $90,388.88. The ninth vessel was sold for $141,241.41, a price attributed by an experienced engineer to an uninformed bid. The price obtainable for Liberty-type ships for scrapping is determined principally by reference to the price of No. 1 scrap steel, and the cost of preparation, towing, insurance, and other costs of scrapping. A buyer for scrapping is influenced by the estimated future of the scrap steel market because of the time required to prepare and sell the scrap steel. In December of 1957, scrap steel prices were falling. The amount which a buyer could be expected to offer for a Liberty-type ship for scrapping at that time was between $53,000 and $60,000. Opinion The question is whether under section 167 of the 1954 Code any depreciation deduction is allowable for the period in 1957 during which *33 petitioner used the Feuer in its business. The respondent's position is that since the depreciated cost of the Feuer at the beginning of 1957 was less than the amount realized upon sale, there is no basis for allowing a deduction for depreciation for 1957; or, stated differently, that since petitioner recovered before the end of 1957 more than the amount of the depreciated cost at the start of the year, a deduction for depreciation in 1957 is not allowable. Respondent relies on Cohn v. United States, 259 F. 2d 371 (C.A. 6, 1958); Rev. Rul. 62-92, 1962-1 C.B. 29; [1]Massey Motors, Inc. v. United States, 364 U.S. 92 (1960); and Hertz Corporation v. United States, 364 U.S. 122 (1960). *34 In his statutory deficiency notice, the respondent failed to state specifically the reason for his determination. His argument here, however, makes it clear that upon auditing petitioner's 1957 return his inquiry was whether a deduction of $135,367.24 for 1957 for depreciation of the Feuer was reasonable; he took the view that the reasonableness of the claimed deduction for depreciation depended upon the conditions and facts known to exist at the end of 1957; and he concluded that the fact that the asset, having an undepreciated cost of $326,627.73 at the start of 1957, was sold before the end of the year for $695,500, made unreasonable any deduction for depreciation for the year of the sale. Section 167(a) of the Code provides that there shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear of property used in a business; and section 167(b) provides that for taxable years ending after December 31, 1953, "the term 'reasonable allowance' shall include (but shall not be limited to) an allowance computed in accordance with regulations prescribed by the Secretary or his delegate, * * *." The pertinent sections of the Commissioner's Regulations *35 are sections 1.167(a)-1(a), (b), (c), and 1.167(b)-0. It is not necessary to set forth in their entirety the provisions of the applicable Regulations other than to state the following: 1. * * * The reasonableness of any claim for depreciation shall be determined upon the basis of conditions known to exist at the end of the period for which the return is made. It is the responsibility of the taxpayer to establish the reasonableness of the deduction for depreciation claimed. * * * (Section 1.167(b)-0.) 2. * * * Salvage value must be taken into account in determining the depreciation deduction either by a reduction in the amount subject to depreciation or by a reduction in the rate of depreciation, but in no event shall an asset (or an account) be depreciated below a reasonable salvage value. * * * (Section 1.167(a)-1(c).) The petitioner had the burden of proving that the claimed depreciation deduction represents a reasonable allowance under section 167 of the Code. The dispute relates only to the year in which the asset was sold. Petitioner takes the position that it is reasonable to allow a deduction for depreciation for the wear and tear sustained from the use of the asset in *36 its business during the taxable year up to the time of delivery to the buyer in December 1957; that granting a reasonable allowance for depreciation through use is a matter which is separate from computing the gain realized from a bona fide sale; and that respondent's determination involves circuitous reasoning in equating the amount received in a bona fide sale with salvage value with respect to the proposition that an asset shall not be depreciated below its salvage value, under the facts and circumstances of this case in which petitioner, with the advice and consent of the Internal Revenue Service, made allegedly reasonable estimates just before the time of the acquisition of the Feuer of both the useful life in its business of the ship, and of salvage value. In attempting to meet its burden of proof, petitioner presented extensive evidence in support of its original estimate of salvage value in the amount of $54,000. That evidence establishes that due to declining prices of ships, charter rates, and scrap steel toward the end of December 1957, some Liberty-type ships were being sold for scrap at prices between $53,000 and $60,000 at the end of 1957. Respondent has not questioned *37 petitioner's original estimate of a 3-year useful life of the Feuer in its business. The record does not show that in petitioner's past experience it followed a practice of using ships for a short time and then reselling them. Thus, it cannot be said that it was petitioner's policy "to dispose of assets which are still in good operating condition," in which case "the salvage value may represent a relatively large proportion of the original basis of the asset." See section 1.167(a)-1(c) of the Regulations relating to salvage value. Petitioner contends that this case is distinguishable from those where the taxpayer did not make any estimate of salvage value when acquiring an asset and left salvage value at zero; and argues that it is to be observed that the Commissioner's resort to resale price as evidence of salvage value in the year of sale probably may be explained by the fact that in those instances the taxpayers had computed their annual depreciation deductions on the basis of an estimated useful life without any estimated salvage value. Cf. Evans v. Commissioner, 264 F. 2d 502, 504, reversed 364 U.S. 92; Cohn v. United States, supra, pp. 374, 375; *38 United States v. Massey Motors, 264 U.S. 552, 554, affd. 364 U.S. 92; Randolph D. Rouse, 39 T.C. - (October 10, 1962). Petitioner relies primarily upon early authorities, decided before Massey Motors, Inc. v. United States, supra, and related cases, in which depreciation allowances were allowed in the year of sale and depreciation was regarded as separate from the computation of the adjusted basis of property, and the gain or loss resulting from a sale was arrived at by use of cost depreciated up to the time of sale and sale price. These authorities include the following: United States v. Ludey, 274 U.S. 295 (1927); Even Realty Co., 1 B.T.A. 355 (1925); Capital City Investment Co., 4 B.T.A. 933 (1926); Max Eichenberg, 16 B.T.A. 1368 (1929); Herbert Simons, 19 B.T.A. 711, 713-714 (1930); Thos. Goggan & Bro., 45 B.T.A. 218 (1941); and the decision of the issue in Wier Long Leaf Lumber Co., 9 T.C. 990, 999 (1947), affd. and revd. on other issues, 173 F. 2d 549 (C.A. 5, 1949), dealing with depreciation of automobiles (p. 999). It was stated *39 in the Ludey case that the theory underlying the allowance for depreciation is that by using up an asset in a business "a gradual sale is made of it" and the depreciation charged is the measure of the cost of the part which has been "sold" through the use of the asset. Petitioner contends that the "formula" of the Ludey case is the keystone of the respondent's depreciation regulations and that his regulations have attempted to stabilize depreciation allowances by "strictly limiting the circumstances under which the useful life and salvage value determined at the time of acquisition of the asset may be changed". Petitioner relies upon the provisions in section 1.167(a)-1(b) and (c) which provide that "estimated remaining useful life shall be redetermined only when the change in the useful life is significant" and when "there is a clear and convincing basis for the redetermination"; and that salvage value "shall not be changed at any time after the determination made at the time of acquisition merely because of changes in price levels." The only circumstance in which the regulations authorize redetermination of salvage value is in connection with redetermination of useful life, in which *40 case "salvage value may be redetermined based upon facts known at the time of such redetermination of useful life." Petitioner argues that respondent's determination violates the concept which he has adopted in his long-standing regulations that useful life and salvage value are interrelated terms, and that respondent, in attempting to equate sales price to salvage value in every circumstance, has failed to recognize the vital "difference between a dead plant and a live one." Omaha v. Omaha Water Co., 218 U.S. 180, 202 (1910). Petitioner agrees with respondent that an asset may not be depreciated below a reasonable salvage value, but asserts that resale price is not always the measure and equivalent of salvage value. Petitioner argues that "if the taxpayer decides to sell an asset while it is still alive and productive in his business, he is realizing something other than salvage value." Petitioner's contentions emphasize the point that the Feuer was sold before the end of its useful life in its business, was not fully depreciated at the time of sale, and fetched a high price when sold because of extraneous economic conditions. In these circumstances, argues petitioner, *41 respondent should be held to what appears to have been established rules, as follows: (1) "[That] in computing the gain from the sale of property a deduction of depreciation during the period of operation shall be made." Rieck v. Heiner, 25 F. 2d 453, 454, (C.A. 3, 1928), certiorari denied 277 U.S. 608, following United States v. Ludey, supra; Herbert Simons, supra; Duncan-Homer Realty Co., 6 B.T.A. 730, 732. (2) "[Mere] appreciation in value due to extraneous causes has no influence on the depreciation allowance, one way or the other. * * * The sole fact therefore in any specific situation that a given price is received for articles not fully depreciated throws no light on the effect upon the depreciation allowance. * * * The depreciation deduction cannot be disallowed merely by reason of the price received for the article without the consideration of other factors." Wier Long Leaf Lumber Co., supra, &. 999. Petitioner's argument and the authorities relied upon have been fully considered. But the concept of depreciation for tax purposes is rather complex, and changes in economic conditions have brought *42 about new considerations by the courts of the old, well established rules relating to depreciation allowances in the light of the rising market prices of used assets and the corresponding realization of large gains upon the resale of such used assets. For example: The Supreme Court in the cases of Massey Motors, Inc., and Hertz Corporation has taken into account the "formula" of the Ludey case but it has emphasized the statutory objective of achieving "an accurate determination of the net income from operations of a given business for a fiscal period", and it has clarified the meaning of "salvage value" by recognizing that under present market conditions "salvage value" must include resale or second-hand value. Thus, in Massey Motors, the Supreme Court expressed the view that the Congress "intended that the taxpayer should, under the allowance for depreciation, recover only the cost of the asset less the estimated salvage, resale or second-hand value. This requires that the useful life of the asset be related to the period for which it may reasonably be expected to be employed in the taxpayer's business. Likewise, salvage value must include estimated resale or second-hand value." Also, *43 in Hertz Corporation (although dealing with the declining balance system of depreciation), the Supreme Court indicated that it does not comport with the overriding statutory requirement that the depreciation deduction be a reasonable allowance, to allow depreciation deductions "beyond what reasonably appears to be the price that will be received when the asset is retired." The facts and circumstances in the authorities on which the petitioner relies must be regarded as distinguishable from the facts and circumstances of this case when considered in the light of the Supreme Court's reasoning in the Massey Motors and Hertz cases, recently decided. This Court in Randolph D. Rouse, supra, has indicated the above understanding in its holding that a depreciation deduction is not allowable for the year in which an asset is sold where the sale price of such asset is in excess of the asset's undepreciated cost as of the beginning of the year of the sale. In so holding, it was regarded as determinative that the excess of the sale price over and above the remaining undepreciated cost at the beginning of the year of the sale was substantial. That fact is present in this case. Also, this Court *44 in the Rouse case followed the reasoning in Cohn v. United States, supra, on which respondent relies. The facts here do not provide the distinction which is required in order not to arrive at the same result as this Court reached in the Rouse case. This is observed with full recognition of the point that Rouse at no time made any estimate of the salvage value of the assets involved. In Massey Motors, Inc., also, the taxpayer had not made estimates of salvage values of assets. It is the force of the reasoning about the statutory requirement that to be deductible, depreciation allowances must be reasonable, contained in the opinions of the courts in the Cohn and Massey Motors cases, and the interpretation of the term "salvage value" as including resale or second-hand value, which compels the conclusion reached by this Court in the Rouse case. Under all of the circumstances, it is necessary to recognize the Rouse case as dispositive of the question presented in this case. We are unable to find that in reasoning and principle, there is a valid distinction between the Rouse case and this one. It follows that the respondent properly determined that the claimed depreciation *45 deduction for 1957 is not allowable under section 167; the respondent's determination is sustained. Decision will be entered for the respondent. Footnotes
1. The provision in section 1.167(a)-1(c) of the regulations to the effect that salvage value shall not be changed at any time after the determination made at the time of acquisition merely because of changes in price levels applies to assets still on hand. The provision does not preclude adjustment of salvage value where there is a clear and convincing basis therefor even though no adjustment of useful life is required. The purpose of the provision is to eliminate needless and endless controversies over depreciation allowances which at best are merely informed estimates of the cost of using the property in the taxpayer's business. That purpose has been served when the asset is disposed of and when a final transaction has occurred over which there can be no dispute or difference of opinion or judgment. These rules are and have always been applicable to the allowance of the deduction for depreciation. See Massey Motors, Inc. f. United States and Commissioner v. Robley H. Evans, et ux., 364 U.S. 92 (1960), Ct. D. 1847, C.B. 1960-2, 445; and Hertz Corporation v. United States, 364 U.S. 122 (1960) Ct. D. 1848, C.B. 1960-2, 70. Accordingly, it is the position of the Service that the Cohn case ( Cohn v. United States, 259 F. 2d 371 (C.A. 6, 1958)) applies equally to the 1939 Code and the 1954 Code and that it is not only reasonable but proper to take the ultimate facts into consideration in determining the depreciation deduction for the year of disposition of the asset. Therefore, the deduction for depreciation of an asset used in the trade or business or in the production of income shall be adjusted in the year of disposition so that the deduction, otherwise properly allowable for such year under the taxpayer's method of accounting for depreciation, is limited to the amount, if any, by which the adjusted basis of the property at the beginning of such year exceeds the amount realized from sale or exchange. See also section 1.167(a)-10 of the regulations for rules with respect to when depreciation is allowable. * * *↩