## ALBRIGHT v. UNITED STATES.

### No. 13784.

United States Court of Appeals
Eighth Circuit.
March 10, 1949.

WOODROUGH, Circuit Judge, dissenting.

———◆——

Dennis D. Daly, of St. Paul, Minn., and Allan E. Finseth, of Kenyon, Minn., for appellant.

Theron Lamar Caudle, Asst. Atty. Gen., George A. Stinson, Ellis N. Slack, Lee A. Jackson, and Sumner M. Redstone, Sp. Assts. to Atty. Gen., and S. Walter Shine, Atty. Department of Justice, of Washington, D. C., and John W. Graff, U. S. Atty., of St. Paul, Minn., for appellee.

Before GARDNER, Chief Judge, and WOODROUGH and RIDDICK, Circuit Judges.

RIDDICK, Circuit Judge.

The question on this appeal is whether profits realized from sales of livestock from a dairy herd maintained for the production and sale of dairy products and from sales of a breeding herd maintained for the production and sale of livestock constitute ordinary income or are to be treated as capital gains under section 117(j) (1) of the Internal Revenue Code, 26 U.S.C.A., § 117.[1]

The taxpayer is a farmer whose principal income is derived from the sale of dairy products and hogs.

[1] "§ 117. Capital gains and losses

"(a) Definitions. As used in this chapter—

"(1) Capital Assets. The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (l), or an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue, or real property used in the trade or business of the taxpayer;

* * * * * *

"(b) Percentage taken into account.

"In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net capital gain, net capital loss, and net income:

"100 per centum if the capital asset has been held for not more than 6 months;

"50 per centum if the capital asset has been held for more than 6 months.

* * * * * *

"(j) Gains and losses from involuntary conversion and from the sale or exchange of certain property used in the trade or business—

"(1) Definition of property used in the trade or business. For the purposes

In his dairy operations the taxpayer maintains a herd of 36 dairy cattle, of which an average of 18 to 20 head are producers of milk which the taxpayer sells to local creameries. Calves which are not needed for the maintenance of the dairy herd at the desired number are sold on the market. Dairy cows which by reason of age, injury, or disease are unfit for maintenance in the dairy herd, or which because of decreased milk production are economically less desirable than available young stock, are sold and replaced by young stock raised by the farmer.

In 1945 the taxpayer received $141.83 from the sale of calves, $3,986.39 from the sale of dairy products, and $482.99 from the sale of dairy cows. All of the cows sold in 1945 had been held by the taxpayer in his dairy herd for more than four years.

In 1946 the taxpayer received $101.45 from the sale of calves, $4,421.38 from the sale of dairy products, and $1,152.44 from the sale of eight cows and two heifers removed from the dairy herd. The heifers had been maintained in the dairy herd for more than two years and the cows for longer periods.

In his hog-raising business the taxpayer regularly maintained a breeding herd of ten sows and one boar. Each year, as soon as they are marketable after the breeding season, the taxpayer sells his breeding herd, replacing it with an equal number of young sows raised by him and with another boar purchased from a neighboring farmer. The evidence is that this is the usual and customary practice in the hog-raising industry. The hogs raised, with the exception of the ten sows retained for breeding purposes, are sold on the market.

In 1945 the taxpayer received from the sale of hogs raised for market $2,500.23, and from the sale of his breeding herd $660.44. In 1946 the taxpayer received from the sale of hogs raised for market $2,142.80, and from the sale of his breeding herd $671.80. In each year the animals in the breeding herd had been held for more than six months, the majority for one year or more before sale.

In his income tax returns for the years 1945 and 1946 the taxpayer in computing his net income included his receipts from the sale of dairy products and calves and from the sale of hogs raised for and sold on the market. He treated the amounts received from the sale of cows removed from the dairy herd and from the sale of his breeding herd of swine as capital gains, and included only 50 per cent of these amounts in his computation of net income. The Commissioner ruled that the sales from the dairy and breeding herds were productive of ordinary income and, as such, includible in full in the taxpayer's income for the years mentioned. He determined deficiencies in taxpayer's income tax for each year, which taxpayer paid and brought this action to recover. This appeal is from the judgment of the District Court in favor of the United States.

Section 117(j), so far as material in the present action, provides that the recognized

---

of this subsection, the term 'property used in the trade or business' means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (*l*), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. *  *  *

"(2) General rule. If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft, or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. *  *  *"

gains and losses from the sale or exchange of property used in the trade or business of the taxpayer, held for more than six months, which is of a character subject to the allowance for depreciation provided in section 23(l), is not of a kind properly includible in the inventory of the taxpayer if on hand at the close of the taxable year, and is not held by the taxpayer primarily for sale to customers in the ordinary course of trade or business, shall be treated as gains and losses from the sale or exchange of capital assets held for more than six months if the aggregate of such gain exceeds the aggregate of such losses. See Sections 29.117-1 and 29.117-7 (as amended by T.D. 5394, 1944 Cum.Bull. 274, 276), Treasury Regulations 111.

Section 117(b) of the Internal Revenue Code provides that in the case of a taxpayer, other than a corporation, only 50 per cent of the gain or loss recognized upon the sale or exchange of a capital asset, held for more than six months, shall be taken into account in computing net capital gain, net capital loss, and net income.

In order for the taxpayer to come within the provisions of section 117(j) permitting him to treat the sales from his dairy and breeding herds as sales of capital assets, the burden is upon him to show: (1) that the animals sold were used in his trade or business; (2) were subject to allowance for depreciation; (3) were held for more than six months; (4) were not property of the kind includible in the inventory of the taxpayer if on hand at the close of the taxable year; and (5) that the animals were not held by the taxpayer *primarily* for sale to customers in the ordinary course of his trade or business. In the brief filed on behalf of the Government it is admitted that the taxpayer has established the first four of these requirements. The Government's contentions in support of the ruling of the Commissioner are: (1) that taxpayer has not established by the necessary proof that the animals sold from the dairy and breeding herds were not held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, and (2) that the

sales in question were not such as to come within the terms of section 117(j) under the interpretation of that section by the Income Tax Unit of the Internal Revenue Bureau. These two separate contentions are in reality but one since the facts in this case are undisputed, and on the facts established by the evidence the Bureau has ruled that profits from sales of the kind shown by the evidence in this case are not to be treated as capital gains within the meaning of section 117(j).

The first ruling relied on by the Government is I.T. 3666, 1944 Cum.Bull. 270, issued in response to a request for advice relative to the application of section 117(j) to gains and losses from the sale or exchange of livestock acquired or raised and retained for draft, breeding, or dairy purposes. That part of I.T. 3666 pertinent to the question here is:

"* * * it is held that any livestock used for draft, breeding, or dairy purposes, irrespective of whether such livestock was raised or otherwise acquired, is property used in the trade or business, of a character which is subject to the allowance for depreciation, within the meaning of section 117(j) of the Internal Revenue Code, provided it is held for more than six months. This is equally true whether the farmer keeps his books and files his returns upon the cash receipts and disbursements basis or upon the accrual basis.

"The sale of animals culled from the breeding herd as feeder or slaughter animals in the regular course of business is not to be treated as the sale of a capital asset."

The second ruling relied on by the Government is I.T. 3712, 1945 Cum.Bull. 176, issued to explain and amplify I.T. 3666. The phrase "culled from the breeding herd" is defined as:

"the normal selection for sale of those animals which, due to injury, age, disease, or for any other reason (other than that of changing the breed or the quality of the offspring) are no longer desired by the livestock raiser for breeding purposes, and also the normal selection for sale of animals for the purpose of maintaining the

herd at a regular size. The primary factor is normal practice in the case of the particular taxpayer involved."

The third or special ruling relied on by the Government is contained in a letter of the Commissioner dated August 4, 1947 (1948 C.C.H., para. 6091), in response to an inquiry from a member of the Senate. The letter is a further explanation and amplification of I.T. 3666 and I.T. 3712. The Commissioner states that representatives from the Commissioner's Office, the Chief Counsel's Office, and from the Treasury Department were called before the Ways and Means Committee of the House of Representatives to discuss the question of capital gain on the sale of cattle, particularly sales from a dairy herd. The Ways and Means Committee was advised by these representatives that the Bureau would adhere to its position taken in I.T. 3666 and I.T. 3712 concerning the sale of "culls" as ordinary income, but that the Bureau conceded that the determination of what should be classed as "culls" is difficult and depends upon the peculiar facts in each case. The Commissioner defined "culls" as follows:

" 'Culls' not only represent animals sold because they had passed their state of economic usefulness or were undesirable for other purposes but also represent animals regularly sold from the breeding or dairy herd in order to keep the herd at a desirable size."

Referring to previous rulings of the Bureau, the Commissioner says:

"In I.T. 3712 it is stated that since in many cases it will be found impractical to determine accurately the number of animals sold from the herd which would be subject to section 117(j), the following prima facie test is provided for the guidance of livestock raisers: If the number of animals sold from the herd during a taxable year exceeds the number of animals added to the nerd, the excess animals sold represent a reduction in the herd and are considered to be animals held for draft, breeding or dairy purposes, gain on the sale of which (if held for more than six months) is subject to section 117(j) of the Code.

\* \* \* \* \* \*

"The prima facie presumption that sales made from the breeding or dairy herd which do not reduce the size of the herd because of addition of raised animals result in ordinary income is always subject to rebuttal and should not be applied arbitrarily. The classification of 'culls' was intended to include all animals sold from the breeding herds that represent regular sales made from such source in the ordinary operation of the taxpayer's business."

The Government also advances the argument that the passage by the House of Representatives of the Revenue Revision Bill of 1948, which did not pass the Senate, section 134 of which amended section 117 (j) (1) by providing that property used in trade or business includes animals used in the trade or business of the taxpayer except those animals which customarily would be selected during the taxable year for sale or exchange in the ordinary course of his business, indicates that the House of Representatives placed the same interpretation on section 117(j) (1) before amendment as the Bureau placed upon it in the rulings referred to above.

Although section 117(j) was added to the Internal Revenue Code in 1942, the question in this action apparently never arose before 1944 when I.T. 3666 was issued. That ruling, as we have shown, held that livestock used for draft, breeding, or dairy purposes was property used in the trade or business of the owner within the meaning of section 117(j), but that animals culled from a breeding herd *as feeder or slaughter animals* in the regular course of business were not property used in the trade or business of the owner within the meaning of the section. No reference was made to culls in the case of stock used for draft or dairy purposes. Taking the language of the ruling in reference to sales of culls from breeding herds literally, it applies only to animals removed from breeding herds and thereafter held for sale for feeding or slaughter in the regular course of the breeder's business. The reference is to livestock breeders regularly engaged in the business of raising livestock for sale on the market as feeders or for slaughter and to animals removed from the

breeding herd and thereafter held by the owner primarily for sale in the regular course of this business. The assumption on the part of interested taxpayers that animals held for more than six months for dairy or breeding purposes and sold for the purpose of maintaining the dairy or breeding herd at the size required for the economical operation of the taxpayer's business, or because, by reason of age, injury, or disease, unfit for the purpose for which they were held, were not animals culled from the herd and held as feeders or slaughter animals in the regular course of taxpayer's business within the meaning of I.T. 3666 is certainly not unreasonable. On the contrary, it was in accord with the plain language used in the ruling in question.

The conflicting interpretations placed upon I.T. 3666 by the Commissioner and interested taxpayers show that the ruling in question, issued to interpret and explain section 117(j), itself required interpretation and explanation. The result was I.T. 3712, which introduced for the first time the factor of normal and abnormal sales from breeding herds, but, significantly, made no reference to dairy herds. And it was not until 1947, when the so-called special ruling was issued in response to complaints of the dairy industry that the Commissioner was saying one thing and doing another, that the interpretation now placed upon section 117(j) was made to apply to so-called normal sales from dairy herds.

Section 117(j) was intended as a relief measure applicable alike to all taxpayers within its provisions. Leland Hazard v. Commissioner, 7 T.C. 372. That it was so intended is clearly expressed in the report of the Committees of the House of Representatives and of the Senate in charge of the bill. See H. Rep. No. 2333, 77th Cong., 2d Sess., pp. 53-54 (1942-2 Cum. Bull. 372, 415), and S. Rep. No. 1631, 77th Cong., 2d Sess., p. 50 (1942-2 Cum.Bull. 504, 545). The section provided an entirely new method of reporting gains and losses on the sale of noncapital assets used in the trade or business of the taxpayer. The amendment permits the taxpayer to deduct in full the net loss resulting from transactions within the purview of the section and to report the net gain only to the extent of 50 per cent. Nothing in the language of the Act indicates an intention on the part of Congress to deny the relief granted by the section to any taxpayers whose transactions meet the prescribed conditions. The Commissioner has ruled that livestock held by a farmer for dairy, breeding, or draft purposes are, while so held and used, depreciable assets, not primarily held for sale to customers in the ordinary course of his business. Nothing in the language of the section justifies the inference that a farmer should be denied the right to treat the profits received from the sales of such livestock when they are no longer profitable or fit for use in the farmer's business as productive of capital gains and not of ordinary income. This, however, is the effect of the ruling relied on by the Government.

In this case the taxpayer testified that he tried to maintain an average herd of 36 dairy cattle, because the size of his farm, its equipment for dairy purposes, and its production were adequate for a herd of that size. And it is fair to assume, we think, that a farmer engaged in the production of dairy products would work toward the acquisition and maintenance of a herd no larger and no smaller than adequate for the production of dairy products for which a stable market was available Sound business practice would also require that he replace worn out and depreciated animals with others, younger and more productive. This would result in more or less regular sales of animals from his herd without decreasing its size from year to year. A dairy farmer is not primarily engaged in the sale of beef cattle. His herd is not held primarily for sale in the ordinary course of his business. Such sales as he makes are incidental to his business and are required for its economical and successful management. The rulings relied on by the Government would place a penalty upon sound business practice or deny to the dairymen the benefits of section 117(j). In order for the dairyman to treat his sales of depreciated stock as sales of capital assets, the Commissioner would require him to gradually retire from his business by selling more of his herd each year than he added to it, or to maintain in alternate

years a herd of a size greater or less than that permitted by sound business practice.

The case for the Government on taxpayer's sale of his breeding herd of hogs has a better foundation in reason. The sale of hogs for slaughter is not a mere incident to the farmer's hog breeding business, but the main object of it. It is not unreasonable to rule, as the Commissioner has done, that a farmer engaged in the business of raising hogs for sale on the market who, for any reason, removes animals from his breeding herd and transfers them to the herd held for slaughter while he brings them to a marketable condition, primarily holds the animals so removed for sale in the ordinary course of his business. But the taxpayer in this case testified that the normal practice in the hog-raising industry was the annual sale of the whole breeding herd and its replacement by a new one. Since this is the normal practice in the industry, we must assume that it is necessary to an efficient and economical operation of the business. And since the taxpayer's sale of his breeding stock is annually of the whole herd, there would seem to be no room for application of the normal-abnormal sales factor. The normal sale being of the whole herd, the herd is not only reduced in size but entirely removed from the taxpayer's business. Obviously, it can not be sold until it has returned to marketable condition, but the retirement of it for that period does not show that the taxpayer has not held it for the purpose of breeding and not primarily for sale for the time required by the statute.

We conclude that the interpretations of the Commissioner are contrary to the plain language of section 117(j) and to the intent of the Congress expressed in it. We are not impressed by the argument on behalf of the Government concerning the passage by the House of Representatives of the Revenue Revision Bill of 1948 amending section 117(j) to make explicit in the Act the interpretation which the Commissioner has placed upon it. The House of Representatives is not the Congress. One inference reasonably to be drawn from this action of the House of Representatives is that the representatives of the Treasury were successful in convincing the Committee in charge of the bill that the amendment was necessary in order to make explicit in the Act what the Commissioner has read into it.

In reaching the conclusion announced we have not overlooked the rule that the administrative interpretations of an ambiguous statute by those in charge of its administration and enforcement are to be given great weight by the courts. See Brewster v. Gage, 280 U.S. 327, 336, 50 S.Ct. 115, 74 L.Ed. 457; White v. Winchester Country Club, 315 U.S. 32, 41, 62 S.Ct. 425, 86 L.Ed. 619; Becker v. Anheuser-Busch, Inc., 8 Cir., 120 F.2d 403, 413. But we find nothing ambiguous or doubtful in the section of the Revenue Act under consideration. Such ambiguity or doubt as confronts us in the present case comes from the administrative interpretations rather than from the Act interpreted. Douglas v. Edwards, 2 Cir., 298 F. 229, 245; Manhattan General Equipment Co. v. Commissioner, 297 U.S. 129, 134, 56 S.Ct. 397, 80 L.Ed. 528.

Judgment reversed and the case remanded with directions to enter judgment for appellant.

WOODROUGH, Circuit Judge (dissenting).

The reasoning and decision of the trial court appeal to me as sound, and I would decide the case for the government. In order to recover here, the taxpayer had to prove that when he sold the cows and sows from which he received the profits that have been taxed as income they were not held by him "primarily for sale to customers in the ordinary course of his business." The facts are that he raised the cows intending to milk them for a while and then sell them, and the sows intending to breed them for a while and then sell them. Though the selling is the last stage it is integral to the farming, constantly in mind and as I see it as "primary" as any other purpose of the farming. The relevant provisions of the revenue laws do not indicate

to me that Congress intended to relieve farmers of tax on the income they receive from raising cows and sows intended for sale and selling them in the ordinary course of the farming.