**DUVAL MOTOR COMPANY, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 17262.

United States Court of Appeals
Fifth Circuit.
Feb. 26, 1959.

William R. Frazier, Hill & Frazier, James P. Hill, Jacksonville, Fla., for petitioner.

Carolyn R. Just, Meyer Rothwacks, John J. Pajak, Robert N. Anderson, Lee A. Jackson, Attys., Dept. of Justice, Washington, D. C., John M. Morawski, Sp. Atty. and Arch M. Cantrall, Chief Counsel, I.R.S., Washington, D. C., Charles K. Rice, Asst. Atty. Gen., for respondent.

Before RIVES, TUTTLE and CAMERON, Circuit Judges.

TUTTLE, Circuit Judge.

Petitioner is a franchised Ford automobile dealer in Jacksonville, Florida. During the fiscal years ending March 31, 1951 and 1952, the tax years here in question, it bought and sold new cars and used cars, operated a parts and service department and operated a body shop. In the fiscal year ending March 31, 1951, it sold 1,826 new cars and trucks, and 2,415 used cars and trucks. In fiscal year 1952 it sold 1,286 new cars and trucks and 2,500 used cars and trucks. It paid cash for all new cars and trucks delivered to it from the Ford Motor Company.

It was the taxpayer's custom to withdraw from each year's new models purchased by it and by it initially placed in inventory a number of cars which were assigned to the company executives, new car salesmen and department heads. These cars were transferred for accounting purposes from Account No. 120, designated New Car and Trucks Inventory, to Account No. 153, designated Company Cars. At or soon after the new models for the subsequent model year were received these cars were placed in the taxpayer's used car lot and sold. The taxpayer took depreciation on these cars and upon their sale, usually within a year of their acquisition, treated the gain on such sale figured on a basis of the depreciated cost of the cars, as being entitled to capital gains treatment under Section 117(j) of the Internal Revenue Code of 1939.[1]

The Commissioner disallowed the deduction for depreciation and determined that the cars did not qualify as property used in the trade or business because they were "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."

The question here is the correctness of the Tax Court's decision supporting this determination. There is also the subsidiary though important question whether the determination of the Tax Court that this property was held primarily for sale to customers in the ordinary course of its trade or business is unreviewable except upon a finding that it was clearly erroneous because it decides a fact issue or is open for review by us freed of the clearly erroneous rule because it is a legal inference drawn from undisputed basic facts. See Galena Oaks Corp. v. Scofield, 5 Cir., 218 F.2d 217.

The record discloses that in putting on its affirmative evidence taxpayer sought consistently to avoid characterizing any of the automobiles in question as "demonstrators." The testimony of

---

1. "§ 117. Capital gains and losses.

"(j) Gains and losses from involuntary conversion and from the sale or exchange of certain property used in the trade or business.

"(1) Definition of property used in the trade or business. For the purposes of this subsection, the term 'property used in the trade or business' means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), held for more than 6 months, * * which is not * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *.

"(2) General rule. If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business * * * exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. * * * *" 26 U.S.C.A. § 117(j).

the officers was to the effect that all of the salesmen's, executives' and department heads' assigned cars were for general use in the company's business. Particularly stressed were those day to day housekeeping activities that every business must do, such as going to the bank, to the lawyer's office, paying taxes, etc., to solicit the purchase of used cars, to transport personnel to other cities for business purposes, etc.[2] Not a word was said to the effect that the 18 which in 1951 were assigned to salesmen or the 9 which that year were assigned to executives were ever used to demonstrate the virtues of the 1951 model Ford that these people were then in the business of selling; the number assigned to "salesmen" in 1952 was nine; four were designated "sales car"; seven were assigned to executives; two to a single department head and two were assigned "unknown." The picture as to the use of the cars changed substantially on cross examination. It was conceded by the officers that the salesmen's cars were used for demonstration purposes (although this was minimized) and this was supported by the company's secretary who said in effect that the company executives assigned to the salesmen the style and model cars they were selling. It was also conceded that in certain circumstances executives' cars were used to demonstrate to a customer.

Of the categories of company business listed above (footnote 2) items 3, 5 and 9 were eliminated as to the cars here in issue because either the Commissioner conceded or the Tax Court found that the cars used specifically for these purposes were properly claimed by the taxpayer as used in the business. These and the cars actually used in the parts, service and body departments (some of them not current models) total 25, none of which are here in issue. Of the remaining assigned uses listed above, cross examination showed that items 2 and 7 were minimal, the company's president testifying that such uses were rare. As to item 4, the use is closely related to sales promotion and is thus a demonstration use. We think the Tax Court could disregard as de minimis the amount of usage these 32 salesmen's and executives' cars would have in the collection of delinquent accounts in view of the testimony of the president as to the taxpayer's use of finance companies in the handling of its paper.

2. The brief of petitioner asserts in its "statement of the case," that these cars were used for the following purposes in the operation of the business:

"2. For loan to customers where there was a gap or delay in the delivery of their new-car due to factory delay or installation of extra equipment after a trade was made and before the customer actually got possession of his new car.

"3. For participation in the Duval County Public Drivers' Training Program.

"4. For participation in various civic functions sponsored by organizations, such as American Legion, Gator Bowl Association, and other civic organizations in Jacksonville.

"5. For participation in the 'Welcome Wagon' program, a national organization which pays calls on persons moving to Jacksonville, welcoming them to the City and giving them samples of products and coupons for items sold, offered by the participating merchants in the area.

"6. To transport company salesmen in the purchase and sale of new and used cars and trucks and for the transportation and sale and to maintain good will and finding and soliciting prospective customers.

"7. To lend to customers needing transportation when their cars were being repaired in the service department or the body shop.

"8. To assist in the collection of delinquent accounts.

"9. To pick up customers' cars and tow them to the service department for repairs or to the body shop.

"10. To transport company personnel for the purpose of the purchase of used cars at auctions and from dealers having a surplus of cars on hand.

"11. To transport company representatives on business to other cities.

"12. To transport company officials and personnel to Ford Motor Company distributing warehouse located in Jacksonville approximately six miles from the company's place of business."

We think that it fell well within the range of permissible inference from the evidence before it for the Tax Court to make the following finding of fact:

"It was petitioner's practice that its executives, new car salesmen and department heads should have the use of and drive various models of the current new car which it had for sale. To that end, as new models appeared, petitioner assigned new cars to the individuals in question from the new line of models received. The cars so assigned were to be driven by the individuals to whom they were assigned for the purpose, in part, of displaying to the public and the potential customers therein the various new models of the Ford line of cars. In keeping with that purpose, these cars were at times also made available for use in parades promoted by civic and similar organizations, petitioner furnishing the drivers as well as the cars. They were also used by the new car salesmen in showing the new models to the customers at hand and demonstrating to them the performance thereof. In addition, there were times when such a car might be loaned to a purchaser of a new car pending delivery of the car purchased. The salesman ordinarily had control of the car assigned to him. He would drive it to and from work, and it was available to him at any time he wanted it. There were times, however, when a car so assigned might be borrowed for running an errand in connection with the general operation of the business, and at times such a car might be loaned temporarily to a customer while his car was being serviced or repaired, but such uses were exceptions rather than the rule. The company porter had a car regularly assigned to him for running errands, and the service department had a car regularly assigned to it for loan to customers pending the repair or servicing of their cars. If the customer was a prominent one or the job was of sufficient importance and one of the new model cars assigned as indicated was available, such car might be loaned to the customer. Petitioner did not like to loan the use of the cars in question in that manner, and did so only occasionally and the loans which were so made did not constitute a substantial factor in its business."

Under familiar rules of appellate practice, as defined in Rule 52, F.R.Civ.P. 28 U.S.C.A., which forms the standard of appeal from the Tax Court, we may not set aside or disregard this finding unless it is clearly erroneous. Not only do we not so find it, but we consider it amply supported in the record.

The taxpayer, although criticizing the Tax Court for finding that these cars were used as demonstrators, says that this makes no difference. It relies, however, on the Tax Court's decision in Latimer-Looney Chevrolet, Inc. 19 T.C. 1120 (appeal withdrawn, acq. 1959—1 C. B. 5). In that decision it does not appear that the Tax Court found that any of the cars there in issue were used as demonstrators (although petitioner asserts evidence of such use was in the record). The government, on the other hand, contends that the later Tax Court case of Johnson-McReynolds Chevrolet Corp. v. Commissioner, 27 T.C. 300, is authority for the proposition that where the cars are used in part as demonstrators the taxpayer has failed to show that the automobiles were not held primarily for sale to customers.

We think there need not be too much attention paid to terminology here. When an automobile dealer buys new automobiles for sale, but thereafter takes them out of inventory and puts them to the use for which an automobile is intended in the hands of its ultimate consumer, that is, transporting personnel, and commits them over their reasonable useful life to that purpose in the operation of his business, the mere fact that

he is in the automobile selling business does not deprive him of the right to depreciate such automobiles over their useful life in his hands and sell them thereafter with all the benefits of Section 117(j). That is what the Tax Court or the Commissioner in effect determined occurred with respect to the 25 "company cars" as to which no issue is here raised. On the other hand, where such a dealer buys new cars for sale, puts them into inventory, later removes them temporarily [3] to be used by company officials and salesmen whose primary interest is to stimulate sales of all the dealer's cars, including these very cars in issue, we conclude that under the ordinary meaning of the words used in the statute the "primary" purpose for which the dealer holds the cars during the entire holding by it is for sale to its customers in the ordinary course of its business.

No parallel can be drawn between the temporary use here and the operation by a cattle owner of a breeding or dairy herd in addition to his business of buying and selling cattle. Cf. United States v. Bennett, 5 Cir., 186 F.2d 407, and Albright v. United States, 8 Cir., 173 F.2d 339. See also Carter v. Commissioner, 5 Cir., 257 F.2d 595. In such a case the cattle owner engages in an entirely separate business of breeding cattle or operating a dairy herd. Such cattle as are dedicated to those purposes are, of course, property used in the business and are not held primarily for sale to customers, even where, after they are no longer usable for breeding or dairy purposes they are sold along with inventory cattle. Here there is, of course, no separate business in connection with which these cars were used. As to the separate business of the service department, the parts department and the body shop, the government concedes that cars used in connection with them do qualify. They are not in issue here.

Whether the ultimate finding of the Tax Court that in the terms of the statute the cars were held primarily for sale to customers in the ordinary course of the trade or business is a finding of fact or is a conclusion drawn from the basic facts of record, the result here is the same. We think that on its basic findings the decision of the Tax Court was required. It is affirmed.

CAMERON, Circuit Judge.

I concur in the result.

---

**3.** The term "temporarily" as used by the Tax Court is attacked by taxpayer as being unsubstantiated. Clearly where the purpose from start to finish is to sell the cars after use of one-fourth or less of their useful life, such short use is "temporary."