UNITED STATES of America, Appellant,

v.

MASSEY MOTORS, Inc., Appellee.

No. 17279.

United States Court of Appeals Fifth Circuit.

Feb. 26, 1959.

Carolyn R. Just, Meyer Rothwacks, Joseph F. Goetten, Lee A. Jackson, Attys., Dept. of Justice, Washington, D. C., Edith House, Asst. U. S. Atty., Jacksonville, Fla., Charles K. Rice, Asst. Atty. Gen., James L. Guilmartin, U. S. Atty., Jacksonville, Fla., for appellant.

William R. Frazier, John A. Rush, Jacksonville, Fla., for appellee.

Before RIVES, TUTTLE and CAMERON, Circuit Judges.

TUTTLE, Circuit Judge.

The United States in this appeal attacks the judgment of the trial court permitting the appellee taxpayer to take straight line depreciation figured on the entire useful life on certain company-used automobiles sold by the automobile dealer taxpayer after relatively short use by it generally for more than the original cost to the taxpayer.

Appellee is a franchised Chrysler dealer in Jacksonville, Florida. This case differs from Duval Motor Company v. Commissioner of Internal Revenue, 5 Cir., 264 F.2d 548, decided today in that on this appeal it is conceded by the government, following a finding to such effect by the trial court, that the automobiles here in issue were property used in the trade or business of the taxpayer.[1]

Massey Motors, Inc., a franchised Chrysler dealer, withdrew from the new cars bought by it during the calendar (and tax) years 1950 and 1951, 51 and 53 automobiles respectively. Of these it assigned approximately one half to its executives and other employees for trans-

---

1. No salesmen's automobiles were involved in this case, and there was no evidence that any of these cars were used substantially for any purpose different than if they had been automobiles of a different make from those taxpayer was franchised to sell. On the undisputed facts of this record it seems to us that a respectable case might be made for the proposition that as a matter of law these automobiles sold within the same model year as when bought, and sold generally at a profit above original cost without allowance for depreciation, were held primarily for sale to customers in the ordinary course of taxpayer's business. Since the government does not urge this position, however, and since it is not argued here, we shall not deal further with it.

portation in connection with the company's business. The other half it rented to an unaffiliated finance company at a net rental of 3 cents a mile. From this rental operation it made a substantial net profit. The executives' cars were uniformly sold at the end of 8,000 to 10,000 miles use or the advent of new models, whichever was earlier. The rental cars were sold at the advent of new models or upon 40,000 miles of use. In nearly every instance the company used cars were sold at a substantial profit above the cost, and on the average the rented cars were likewise sold at a profit.[2] The taxpayer figured depreciation on all of the cars on the straight-line basis with no allowance for salvage value. Gains on the sales were computed at capital gains rates with a basis of cost less depreciation.

■ The Commissioner disallowed the capital gains treatment of the gains and also disallowed the depreciation, contending that the automobiles were not property used in the trade or business under Section 117(j) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 117(j), because they were held primarily for sale to customers in the ordinary course of taxpayer's trade or business. The taxpayer paid the resulting deficiency and thereafter filed its claims for refund for the two years. The claims asserted that "the taxpayer contends that it is entitled to a reasonable allowance for depreciation as claimed on the aforementioned automobiles, constituting property used in the trade or business * * * and that the gain realized by it on the sale of said automobiles is reportable as long term capital gain pursuant to the provisions, etc." [3] Upon the disallowance of the claim the suit for refund was filed in the District Court.

The record discloses that the only evidence introduced below related to the business methods of the taxpayer touching on the use of company and rental cars and their subsequent sale, the essential parts of which are stated above, and testimony as to a small "reserve for repossessions," later discussed. No evidence was introduced on the depreciation issue apart from that relating to company practices. The trial court held in favor of the taxpayer on the capital gains treatment on the sale of the cars and also made a finding that the rate of depreciation, utilizing a 36-months estimated useful life without deducting any salvage value, was a reasonable and fair rate.

The government here attacks this finding and the court's conclusion that the claimed depreciation should be allowed. The thrust of its position is that depreciation must be figured with relation to the known useful life of the asset in the hands of the taxpayer rather than the entire useful life of the property itself; that depreciation cannot be figured without considering the salvage value at the end of the useful life in the hands of the taxpayer; that it was demonstrated here that the useful life in the hands of Massey Motors, Inc. was less than a year; and that the salvage value more than equaled original cost; thus the depreciation would be zero.

Taxpayer, to the contrary, asserts that whatever may have once been the meaning of useful life "and whatever meaning it may have under current Treasury Regulations promulgated following enactment of the 1954 Code, at the time here in question 'useful life' meant the whole useful life of the property itself without regard to the length of time it was intended by the taxpayer that it

2. The executives' cars here in issue were sold for $11,272.80 more than their cost and the rental cars were sold for $525.84 more than they cost.

3. This claim, which was of course made the basis of the subsequent suit, demonstrates the fallacy of appellee's contention here that the issue of depreciation was not separately raised in the trial court. Taxpayer put this matter in issue. Where the Commissioner makes a determination disallowing depreciation, the burden is on the taxpayer to prove the correctness of the depreciation claimed.

would be used by him; that the salvage value should properly be that value at the end of the life of the automobiles after they had served their total useful life in the hands of all owners; that total useful life of these automobiles was three years, and that no salvage value would remain thereafter." This is in effect what the trial court held. In light of the facts here that these cars, other than the rented cars, were used approximately 8,000 to 10,000 miles during the first year, and even in the case of the rented cars that they still had a value equaling their cost at the end of the first of the three years, such a holding is so contrary to our knowledge of the facts of life that it must bear close scrutiny.

The statute provides simply that the taxpayer may take as a deduction under the heading of "Depreciation," "a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) (1) of property used in the trade or business." 26 U.S.C.A. § 23(l).

There is no real dispute between the parties here as to the meaning of the statutory terms. Conceptually depreciation is properly a deductible item because the natural wear and tear upon the capital items which a taxpayer uses to produce his income is a cost element in the production of income. The Supreme Court said in 1926:

"The amount of the allowance for depreciation is the sum which should be set aside for the taxable year, in order that, at the end of the useful life of the plant *in the business,* the aggregate of the sums set aside will *(with the salvage value)* suffice to provide an amount equal to the orig-

inal cost." (Emphasis added.) United States v. Ludey, 274 U.S. 295, 300, 301, 47 S.Ct. 608, 610, 71 L.Ed. 1054.

We think it clear that the words "of the plant" in this opinion refer to all depreciable assets alike, not only the fixed assets. Appellee here agrees in its brief that a salvage value must be determined before the application of straight line depreciation over a three year life.[4] It is unfortunate that appellee did not "recognize" this principle when it submitted the case to the trial court rather than insist it was entitled to straight three years' depreciation, which it improperly deducted, contrary to all recognized accounting and legal principles, and thus induced so apparent an error in the judgment of the trial court.[5] Taxpayer's brief concedes that if this question is properly before the court, as we have found it is, the case must be remanded to the trial court to permit it to prove the salvage value—an essential part of its case which it failed to prove on the first trial. It might be simpler for us to reverse the erroneous judgment thus induced by taxpayer and enter judgment dismissing this part of the appellee's suit for failure of proof. However, since we do not feel that substantial justice would be achieved without allowing an opportunity for taxpayer to furnish the proof necessary under the principles of law properly applicable to the case, we shall not give it that direction.

The principal difficulty in figuring depreciation on property of the kind here used is that it is quite doubtful that Congress ever intended that automobiles temporarily used by people in the busi-

4. In its brief appellee states: "We readily recognize the fact that the cost of a business asset depreciated on the straight line method should first be reduced by the estimated salvage value before applying the rate of depreciation in accordance with the decision of the Supreme Court in United States v. Ludey, 274 U.S. 295 [47 S.Ct. 608, 71 L.Ed. 1054]."

5. Having filed its claim for refund on its assertion that "it is entitled to a rea-

sonable allowance for depreciation *as claimed* on the aforementioned automobiles" (emphasis added) the taxpayer squarely assumed the burden of proving the reasonableness of the now concededly erroneous schedule. As pointed out above, there is no merit in taxpayer's contention that the court's finding in favor of this erroneous schedule is not properly before us for consideration.

ness of selling automobiles should be subject to depreciation at all. See Duval Motor Company v. Commissioner of Internal Revenue, supra. As illustrated by the facts in this record, depreciation of $347.93 on a company car, bought for $2,086.43, for a holding period of six and a half months, followed by a sale on a capital gains basis of $2,695 offends all ideas of the real purpose of allowing depreciation.[6] Recognizing full well that tax effects on businesses are not always uniform and, more important, that the incidence of federal taxation is statutory and not always strictly equitable, or always logical, we think it quite appropriate to consider the apparently unintended result that follows from an asserted construction of the tax laws in performing our duty to construe the language of a statute.

The Tax Court, with the acquiescence of the Commissioner, in Latimer-Looney Chevrolet Co., Inc. v. Commissioner, 19 T.C. 120, and the trial court in this case having held, without appeal on the part of the government, that cars such as these here in issue are property used in the trade or business and are thus subject to depreciation, it now becomes necessary for us to apply the statute on depreciation with such light as can be gleaned from the Treasury Regulations and the Tax Court and trial and appellate court decisions.

Taxpayer urges that the construction it advances is consistent with that promulgated by the Commissioner himself, since in Regulations in effect during the tax years in question it is stated:

"The capital sums to be recovered shall be charged off over the useful life of the property, either in equal annual installments, or in accordance with any other recognized trade practice, such as an apportionment of the capital sum over units of pro-

duction." Treasury Reg. 111 Sec. 29.23(l)–5, 1939 Code.

Taxpayer contrasts this with the language in corresponding regulations in existence prior to 1942, the date of the promulgation of the above quoted language. In point of fact, there is no change in the language in the corresponding sections which deal with "Method of computing depreciation." Both before and after 1942 the relevant language of this section of the Regulations was the same. See Section 27.23(l)–5 for 1939 and as amended on Dec. 8, 1942. The change in language in regulations under the depreciation section of the 1939 Code appears in Section 29.23(l)–1. Prior to Dec. 8, 1942, this section, which in reality appears to be a definition section rather than a regulation telling how to compute depreciation, provided in essential part:

"A reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in the trade or business may be deducted from gross income. For convenience such an allowance will usually be referred to as depreciation * *. The proper allowance for such depreciation of any property used in the trade or business is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan (not necessarily at a uniform rate), whereby the aggregate of the amounts so set aside, plus the salvage value, will, at the end of the *useful life of the property in the business,* equal the cost or other basis of the property * * *." (Emphasis added.)

Taxpayer here seems to concede, as we think it must, that if this regulation had been in effect during the tax years here in issue, the useful life of the automobiles would be the life in the hands

6. As we roughly compute the tax savings, *solely because of the use of depreciation on these company cars* where they are accorded capital gains treatment on sale, the automobile mentioned above, instead of yielding Massey Motors a return after taxes, of $250.38 on the suggested Chrysler mark-up of 25%, the automobile, after seven months' use by the company, would yield a return, after taxes, of $550.34.

of the taxpayer. In fact we think the quoted language from United States v. Ludey, supra, is determinative of the matter. It clearly says the test is *the end of the useful life of the plant in the business.*

Taxpayer points to a change in the amended regulations promulgated in 1942, as indicating change in the Commissioner's interpretation of the statute in this respect.

The corresponding language of the 1942 amended regulation is as follows:

"A reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in the trade or business, *or treated under* [Reg.] *section 19.23 (a)–15 as held by the taxpayer for the production of income* may be deducted from gross income. For convenience such an allowance will usually be referred to as depreciation * * *. The proper allowance for such depreciation is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan (not necessarily at a uniform rate), whereby the aggregate of the amounts so set aside, plus the salvage value, will, at the end of the useful life of the *depreciable property,* equal the cost or other basis of the property * * *."

It will be apparent that in the last sentence the words "property in the business" have been eliminated and the words "depreciable property" substituted. A cursory look at the legislative history back of this amendment clearly demonstrates that there was no purpose to express a change in what was meant by useful life. This change was necessitated by an amendment in 1942 to the 1939 Code, which *added* as property entitled to depreciation "property held for the production of income." Thus the regulation which had theretofore dealt only with property used in the trade or business was inadequate, and it had to be amended by the inclusion of the itali-

cized words above. The last sentence could not, of course, thereafter adequately cover both classes of property by referring to "property in the business" because this would not include the new class "property held for the production of income." The language "depreciable property" would, of course, cover both, and it was substituted for "property in the business."

Thus, we think it clear that whatever was understood by the Treasury Department prior to 1942 by useful life remained unchanged by the amendments here discussed. Thereafter, when the 1954 Internal Revenue Code was adopted, without any change in the depreciation section of the law, 26 U.S.C.A. § 167, the Treasury promulgated the Regulations under it. They expressly provide:

"Salvage value is the amount (determined at the time of acquisition) which is estimated will be realizable upon sale or other disposition of an asset *when it is no longer useful in taxpayer's trade or business* or in the production of his income *and is to be retired by the taxpayer.*" (Emphasis added.)

█ It must be borne in mind that there has been no change in the basic statute in any matter here relevant during the entire period of time. We should thus be inclined to look with considerable disfavor on any contention that a slight change in Regulations worked such a double shift in the effect of a simple statute allowing reasonable depreciation. We do not think the Commissioner's Regulations could change the basic concept of depreciation from that announced by the Supreme Court in the Ludey case.

We are supported in our conclusion that there has been no intent by the Commissioner to effect such a change by the further significant fact that prior to and after the 1942 change in Regulations, there was outstanding the Treasury's Bulletin F, universally recognized by all and sundry familiar with tax problems as

## 558

representing the Treasury's theories as to the application of depreciation.[7]

This Bulletin includes the following language under the heading "Allowance for Depreciation and Obsolescence":

> "The proper allowance for exhaustion, wear and tear, including obsolescence, of property used in the trade or business is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan (not necessarily at a uniform rate) whereby the aggregate of the amounts so set aside, plus the salvage value, will at the end of the useful life of the property *in the business*, equal the cost or other basis of the property."
(Emphasis added.)

It will thus be seen that notwithstanding the change in Regulation Section 29.-23(*l*)–1 in December, 1942, no change has been made in Bulletin F which purports to show the "tendency of official opinion" in the Internal Revenue Service. It cannot well be said that the change above discussed was intended to, or did, change the meaning of useful life.

■ We conclude that as to a taxpayer so placed that his business experience has taught him that automobiles, bought by him for sale but temporarily assigned for use in the business with use in the business averaging less than one third of their total usable life[8] can

then be sold at substantially the original cost to him, such automobiles are depreciable by him on the basis of his expected use of the cars in his business and not on the basis of the length of time the car is expected to be usable as a passenger automobile.[9]

■ The statute allows a reasonable amount for depreciation. No regulation, although valid and binding to the extent it does not enlarge or conflict with the statute, can bind the Commissioner to the allowance of anything more than a reasonable deduction for a whole class of taxpayers. A construction of this regulation as contended for by this taxpayer would result in not only a grossly unreasonable deduction for depreciation, but would offend the basic concept of depreciation and its purpose. We, therefore, cannot approve a construction of the regulation that would reach this result, or if we did so, we would have to hold it invalid as to the factual situation here present as not being authorized by the statute.

As we have previously stated, the basic difficulty here arises from the application of depreciation to a type of property held in such circumstances as would raise much doubt that they were considered as depreciable assets when the law was enacted. So long as taxpayers normally used their capital and other business property for the period of time that they

7. Of course, in its initial publication, the Internal Revenue Service was careful to disclaim any authoritative standing for the specific items treated within Bulletin F. Nevertheless, when it was republished in January, 1942, it stated:

> "It contains information and satistical data relating to the determination of deductions for depreciation and obsolescence, from which taxpayer and their counsel may obtain the *best available indication of Bureau practice* and the trend and tendency of *official opinion* in the administration of pertinent provisions of prior Revenue Acts."

8. We have not here commented on the short life of three years here accepted by the trial court. Bulletin F, above referred to, suggests a life of business automobiles, upon the assumption that

their entire life is to be a business one rather than for individual or family use, of five years for all except salesmen. It would seem quite unlikely that a useful life of three years for a passenger automobile used only 8,000 to 10,000 miles the first year would be sustainable even on the taxpayer's theory of the law upon a full development of the case. In any event the correct rate of depreciation is dependent upon proof. None was offered by the taxpayer to justify its taking this unrealistically short life without even providing for any salvage value.

9. For a clear and convincing discussion and analysis of this problem, leading the author to the same conclusion we have reached see Montgomery's Federal Taxes, 37th Edition, Chapter 6, page 4, et seq.

had any substantial vitality left in them the regulations, construed either way, were satisfactory. But when, as here the courts, over the commissioner's opposition, gave Section 117(j) treatment including the right to depreciation, to property used as were these automobiles, it cannot, we think, be said that the Commissioner is bound to his construction of the regulations published under different circumstances, and especially when he consistently took the position that the depreciation regulations did not apply here at all. When he lost that argument he then issued new regulations which do precisely cover this type of property as used here. In doing so he did not intend to and did not—he *could* not—change the law. For us to hold that the new regulations of 1956 had the effect of defining useful life as useful life in the business for the first time would amount to our saying that the Commissioner could by Regulations change the law.

We realize that this conclusion brings us to a different result from that reached by the Court of Appeals for the Ninth Circuit in Evans v. Commissioner of Internal Revenue, 9 Cir., 264 F.2d 502, which has been brought to our attention after argument. With deference, we think that decision, reached after a well-reasoned and painstaking analysis, too greatly emphasizes the Regulations as portraying the Commissioner's position. In effect it says that there is no shifting back and forth by the Commissioner on this construction; but that he has always construed useful life as the total life of usefulness and that he is bound by this consistent practice. There is much to be said for the proposition that taxpayers have a right to rely on the clearly announced construction placed on the laws by the administrative officials whose duty it is to write the regulations and apply them administratively. This is well stated by the excellent opinion in the Evans case. But we feel that that court has overlooked the essential point that all the time these regulations were in effect the Commissioner was making known by litigating everywhere his position that these regulations were not applicable here, no matter how they were construed, because he was contending that these were not depreciable assets at all. Under these circumstances, it could not be said that a taxpayer, so circumstanced as Massey Motors, Inc., could rely on the Treasury's position as saying that he could use the combination of capital gains treatment with depreciation deductions to double its profits after taxes on the sale of such assets. So long as the Commissioner was proclaiming at every opportunity that the depreciation regulation did not apply to this situation at all, it cannot be said that he is bound by language which took on no real significance until the courts held against him on his contention. Thereafter he is free, it seems to us, to argue a construction of the regulations that carries out the intent of the statute rather than being bound by one which frustrates it.

The government contends that as a necessary corollary to our conclusion we should find that on the record here the salvage value at the end of this useful life, approximating one year, exceeds cost, and that no depreciation can be taken at all. We think that the attention of the trial court and both parties was so concentrated on the legal principle that too little attention was paid to the fact issue: what would be a reasonable allowance for depreciation under the principles of law here laid down? Without argument touching the point we should not decide for instance whether salvage value should be the value of the company cars at retail, since that is how they are sold, or whether, since much of the value of the cars in the hands of this taxpayer results from the fact that it is a large buyer and seller of automobiles, the salvage value should be on the wholesale market, since that is the market on which it buys them. We think these matters must be developed on a new trial, which can be limited to such issues as are here discussed without retrying the other issue on which the government does not appeal.

As to the remaining point in the case, the right of the taxpayer to deduct from income for 1951 a small reserve called "Reserve for Repossessions," the parties agree that the same issue has recently been decided by this Court against the government in Texas Trailercoach, Inc. v. Commissioner, 5 Cir., 251 F.2d 395, and also by other Courts of Appeals in Johnson v. Commissioner, 4 Cir., 233 F.2d 952, Glover v. Commissioner, 8 Cir., 253 F.2d 735, Hansen v. Commissioner, 9 Cir., 258 F.2d 585. We think we are bound by those decisions and therefore affirm the action of the trial court touching on this issue. Of course, no final judgment will be entered in the trial court immediately, and in the event the Supreme Court on certiorari already filed decides contrary to our views, the trial court can and should give effect to its decision.

Judgment reversed for further proceedings not inconsistent with this opinion.

CAMERON, Circuit Judge.

I dissent.