Charlie HILLARD and Mary Jane Hillard,
Petitioners,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

No. 17915.

United States Court of Appeals
Fifth Circuit.

Aug. 5, 1960.

Geo. S. Atkinson, Tom B. Rhodes, Dallas, Tex., Ellis Lyons, Washington, D. C., for petitioners.

Meyer Rothwacks, Lee A. Jackson, Rita E. Hauser, Melva M. Graney, Attys., Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Arch M. Cantrall, Chief Counsel, John M. Morawski, Sp. Atty., I.R.S., Washington, D. C., for respondent. Perlman, Lyons & Emmerglick, Washington, D. C., Jess S. Raban, Chicago, Ill., of counsel.

Before JONES, BROWN and WISDOM, Circuit Judges.

JONES, Circuit Judge.

The petitioners, Charlie Hillard and Mary Jane Hillard, husband and wife, ask us to review and reverse a decision of the Tax Court adverse to them. Hillard v. Commissioner, 31 T.C. 961. The Petitioner Charlie Hillard, who will generally be called the taxpayer, lived in Fort Worth, Texas. There he operated three businesses; he operated (1) a car and truck rental business under the name of Hillard's Rent-A-Car, (2) a business of buying and selling used cars which was conducted in the name of Charlie Hillard Motor Company, and (3) a business of financing the sale of motor vehicles which was done in the name of Charlie Hillard Finance Company. The taxpayer owned all of the stock of two corporations, one of which was in the car rental business at Austin, Texas, and the other carried on the same kind of business at Beaumont, Texas. The income tax deficiency assessed against the taxpayer and here contested arises from transactions in the business conducted as Hillard's Rent-A-Car.

Each of the businesses was operated separately from the others. Separate sets of books of record and account were kept. Separate bank accounts were maintained. The office, garage and storage lot of Rent-A-Car was about a mile distant from the office and sales lot of Motor Company. Alston Ellis, an employee of the taxpayer, was the manager of the Motor Company. He negotiated purchases and sales of used cars, issued checks for cars bought and, in general, ran this business. The taxpayer devoted most of his time to Rent-A-Car. In the operation of Rent-A-Car the taxpayer purchased cars from dealers who, because of quantity sales to the taxpayer, granted substantial price discounts. The car rental arrangements of Rent-A-Car were of two types. Some of the cars were rented for short periods of time; by the day, by the week, or by the month. Other cars were leased on an annual basis and these were new cars at the beginnings of the leases. Of the latter type of leases the greater in number were made to B. F. Goodrich Company which leased about 150 to 200 cars at one time. Rent-A-Car made a fleet agreement with General Motors Corporation and another with Ford Motor Company by which Rent-A-Car acquired certain privileges as a quantity purchaser of new cars. Each agreement had application only to the manufacturer's products used in the purchaser's trade or business and not to be held for resale.

We are here reviewing the income tax determination of the taxpayer for the two fiscal years ending June 30, 1952, and June 30, 1953. During these years Rent-A-Car had about 380 cars and

trucks available for renting and leasing. Vehicles which were used for short-term rentals were generally forced by competitive conditions out of rental use after fourteen to sixteen months. Cars leased for yearly periods were usually retired at the end of the lease terms. As vehicles became no longer usable for renting and leasing they were placed in the service garage or on the storage lot of Rent-A-Car. Used car dealers came to the garage or lot and when they saw a car they wanted, a bid for it would be submitted. If a bid was satisfactory to Hillard he would make a sale. Rent-A-Car never advertised vehicles for sale and employed no salesmen. All sales transactions were handled by Hillard personally. Hillard Motor Company was a frequent bidder for the vehicles of Rent-A-Car but was often an unsuccessful bidder. Hillard, for Rent-A-Car, did not require Ellis for Motor Company to take cars and frequently rejected the offers that Ellis made on behalf of Motor Company. Motor Company was operated as a business entity separate from Rent-A-Car and we do not understand that the Commissioner contends otherwise. In 1952 Rent-A-Car sold 255 vehicles of which 97 went to Motor Company. In 1953 Rent-A-Car disposed of 264 vehicles of which 97 were acquired by Motor Company. In 1952 Motor Company sold 342 vehicles; in 1953 it sold 296 vehicles, and in each year it made disposition of the vehicles purchased that year from Rent-A-Car.

During the tax years involved Hillard treated gains from sales of the vehicles, used in the business of Rent-A-Car, which had been held for more than six months, as long-term capital gains, after having depreciated them on the basis of a three-year useful life. For the year 1952 the income tax return showed a long-term capital gain of $92,907.68 and an operating loss of $30,045.51. For the succeeding year the long-term capital gains figure was $91,024.95 and the operating loss was reported as $40,127.04. The Commissioner determined that the vehicles should be depreciated on a basis of four-year useful life rather than on the three-year basis used by Hillard. To this change Hillard assented with the result that his depreciation deduction was reduced with a corresponding increase in his cost basis and a decrease in the gains from vehicle sales. The Commissioner also determined that the sales of vehicles were of "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" and so included the gains on the sales as ordinary income. To this Hillard did not agree. The Tax Court sustained the Commissioner and its decision is before us for review.

The Supreme Court has only recently decided the Massey Motors and Evans cases [1] and the Hertz case,[2] and in so doing determined that taxpayers in the business of leasing and renting automobiles must compute depreciation on their cars upon the basis of the cars' estimated useful life while used in such business, rather than upon the total estimated economic life of the car for all purposes, and that the salvage value to be used in determining depreciation shall be the estimated resale or secondhand value of the car at the end of the estimated depreciation period. The Court found that it was the intent of Congress "that the taxpayer should, under the allowance for depreciation, recover only the cost of the asset less the estimated salvage, resale or second-hand value."

In the case before us the taxpayer initially treated the rental cars as having, for the purpose of depreciation, a three-year life. The Commissioner made a determination that the useful life was four years and that depreciation should be

1. Massey Motors, Inc. v. United States, 80 S.Ct. 1411, 1419, 1424, decided June 27, 1960, affirming Massey Motors, Inc. v. United States, 5 Cir., 264 F.2d 552, and reversing Evans v. Commissioner, 9 Cir., 264 F.2d 502.

2. Hertz Corporation v. United States, 80 S.Ct. 1420, 1424, decided June 27, 1960, affirming Hertz Corporation v. United States, 3 Cir., 268 F.2d 604.

figured on a four-year basis. This would reduce the allowable depreciation and leave a higher remaining cost basis. The taxpayer agreed to the four-year basis for the depreciation and any issue as to the method and period of depreciation was removed from the case. The Commissioner makes the belated discovery and has informed us by a supplemental brief that he adopted an incorrect theory of depreciation and that he should have based it upon the useful life in the taxpayer's business of leasing and renting cars. The Commissioner is correct, as the Massey and Hertz cases have shown, but the Commissioner's discovery comes too late to permit any correction to be made of his error. The question before us as to whether the profits from sales are to be treated as capital gains or ordinary income is a different question from that involving the method of figuring depreciation. But, as to the question before us, we think that the Commissioner applied an incorect theory.

■■ The Commissioner reminds us that we cannot set aside or disregard the findings of fact of the Tax Court unless they are clearly erroneous. Rule 52, Fed. Rules Civ.Proc. 28 U.S.C.A.; 26 U.S.C.A. § 7482(a). This Court is, of course, freed from the clearly erroneous rule where there is no conflict as to the evidence and the question becomes one as to the legal inferences to be drawn from undisputed facts. Galena Oaks Corporation v. Scofield, 5 Cir., 1954, 218 F.2d 217. In giving effect to the clearly erroneous rule we are to give due regard to the opportunity of the trial court to judge of the credibility of witnesses. The Tax Court stated that,

> "We have no confidence in petitioner's testimony or the implication that he sought to have the Court draw therefrom that his purchase of the cars was not motivated predominantly by the anticipated profit upon ultimate resale."

■ The disbelief by the Tax Court of the undisputed statements of the taxpayer was engendered, in part at least, by the effect of the computations before it showing operating losses from the leasing and rental business and profits realized from the sales of cars. But the Tax Court has not considered, it seems, that the leasing operation losses resulted, in no small measure, from the allowance by the Commissioner of excessive depreciation. Under this computation the gains from sales of the automobiles, as found by the Tax Court, averaged $394.46 in 1952, and $423.38 in 1953. How much less it would have been if the Commissioner had applied the correct formula in computing depreciation we cannot say. What the results would have been with respect to the taxpayer's ordinary income computation if a correct amount of depreciation had been allowed as a deduction from gross income we cannot say. The Commissioner too rejects as incredulous the taxpayer's testimony that he did not engage in the leasing and rental of motor vehicles for the primary purpose of making a profit on the sale of them. But in the Massey case the Commissioner did not attack the taxpayer's right to capital gains treatment of profits on the sale of leased cars. In the Massey case the cost basis resulted from a four-year depreciation. In Massey, the gains, with depreciation so computed, were $245 and $350 per car. However, in the Massey case the Commissioner called for a change in the depreciation computation; not in the capital gains method of taxing the profits resulting from sales. We think the taxpayer's testimony might have seemed more probable if the tax had been figured with depreciation computed as it was in Massey. Under the circumstances we are not precluded by the trial court's prerogative as to credibility from a determination that its findings are clearly erroneous. Cf. Gee Chee On v. Brownell, 5 Cir., 1958, 253 F.2d 814; United States v. Johnson, 5 Cir., 1953, 208 F.2d 729. In any event, the question as to whether the taxpayer hoped to profit from leases or from sales, or it may be, from accounting methods, is not a basic question nor one which

should be permitted to be controlling in reaching a decision.

The Tax Court recognized and the Commissioner does not dispute the fact that the taxpayer's car rental business was separate from his used car lot. It is of course true that when the taxpayer bought cars for leasing or renting there was an intention on his part to sell them when they had lived out their useful life for that purpose, and we have no doubt that it was his hope that they might, when sold, be sold for good prices. But the question is, were the cars held primarily for sale to customers in the ordinary course of trade or business. The Tax Court gave an affirmative answer.

We do not think we are required to embark upon any semantic excursion designed to ascertain and to define and limit the meaning of "primarily" as it is used in the taxing statute. In the car rental business a vehicle ceases to be useful and profitable before its normal life has come to an end. When it can no longer be leased or rented the only means by which there can be a realization of the unused value is by sale. Such sales are a necessary incident of the leasing and rental business, but they are only an incident of it and not the business itself. We are unpersuaded, particularly so in the light of the Massey and Hertz cases, that a determination is here permitted that sales and profits from sales were the dominant purposes in the operation by the taxpayer of the car leasing and rental business.

To hold, as we would be required to hold to sustain the Commissioner's position, that "primarily" means ultimately would be out of keeping with the purpose and intent of the statute. United States v. Bennett, 5 Cir., 1951, 186 F. 2d 407; Galena Oaks Corporation v. Scofield, supra. The factual situation here present and the question here presented are substantially the same as were before the Third Circuit in Philber Equipment Corp. v. Commissioner, 237 F.2d 129. There it was said:

"The basic problem is whether, as the Commissioner contends, the property was acquired for the dual purpose of leasing for a period substantially less than its useful life, and thereafter selling; or, as the taxpayer urges, its purchase, use and ultimate disposition were directed to the single purpose of the operation of a truck rental business. We are here concerned with a going operation which involves continuous rental, purchase and sale, and the determinative factor is the purpose for which the property was held at the time of its acquisition and during the period of its use. [Citing cases] The final sale of the property can only be decisive if the taxpayer's business was operated with the final gains from the sale of the vehicles as a determining business purpose." 237 F.2d 129, 131–132.

The situation with which we are dealing is, so far as is material, the same as this Court outlined when it said:

"We think there need not be too much attention paid to terminology here. When an automobile dealer buys new automobiles for sale, but thereafter takes them out of inventory and puts them to the use for which an automobile is intended in the hands of its ultimate consumer, that is, transporting personnel, and commits them over their reasonable useful life to that purpose in the operation of his business, the mere fact that he is in the automobile selling business does not deprive him of the right to depreciate such automobiles over their useful life in his hands and sell them thereafter with all the benefits of Section 117(j)." Duval Motor Co. v. Commissioner, 5 Cir., 1959, 264 F.2d 548, 551–552.

The factual situation in the Duval Motor case differs from this case but the principal there stated is applicable. The Supreme Court, in the Massey Motors case assumed, although perhaps it did not have the question for decision, that capital gains treatment was proper. The Court said, "Furthermore, the 'profits' of the taxpayers here are capital gains

and incur no more than a 25% tax rate." [80 S.Ct. 1414.]

We think the record requires a determination that the rental vehicles of the taxpayer were not held primarily for sale to customers in the ordinary course of his trade or business. If the taxpayer is the recipient of an undeserved tax benefit it will result from the incorrect allowance of depreciation rather than from treating as capital gains the profits realized from the sale of automobiles used in his car leasing and rental business. The decision of the Tax Court will be reversed and the cause remanded with directions to proceed further in accordance with this opinion.

Reversed and remanded.

WISDOM, Circuit Judge (dissenting).

I respectfully dissent. The Court's holding allows a very small tail to wag a big dog. The taxpayer's sales of used cars were an everyday occurrence and a normal part of the operation of the automobile rental business. His practice was to sell rental cars after they had been used for only a year, a period one-third or one-fourth shorter than their useful life. To this taxpayer the used car sales were considerably more significant, in the important matter of staying in business, than the rental operation. Thus, his return for 1952 showed an operating loss of $30,145.31 and a long term capital gain of $92,907.68 on the sales of rental cars. His return for 1953 showed an operating loss of $40,127.04 and a long term gain of $91,127.04. Taking the business as a whole, I feel that the facts support the Commissioner's holding. Here, the profits and losses from the sales of the rental cars came from the everyday operation of the business. In the circumstances of this case, therefore, they should be considered as ordinary income or loss. They are not entitled to the preferential treatment provided in Section 117 for "transactions in property which are not the normal source of business income." Corn Products Refining Co. v. Commissioner, 1955, 350 U.S. 46, 52, 76 S.Ct. 20, 24, 100 L.Ed. 29.